# Exhibit B

**FINANCIAL INDUSTRY REGULATORY AUTHORITY**
**LETTER OF ACCEPTANCE, WAIVER AND CONSENT**
**NO. 2010023771001**

TO:    Department of Enforcement
       Financial Industry Regulatory Authority ("FINRA")

RE:    Hold Brothers On-Line Investment Services, LLC (CRD No. 36816)

Pursuant to Rule 9216 of FINRA's Code of Procedure, Respondent Hold Brothers On-Line Investment Services, LLC ("HBOLIS" or "the Firm") submits this Letter of Acceptance, Waiver and Consent ("AWC") for the purpose of proposing a settlement of the alleged rule violations described below. This AWC is submitted on the condition that, if accepted, FINRA will not bring any future actions against HBOLIS alleging violations based on the same factual findings described herein.

## I.

## ACCEPTANCE AND CONSENT

A.    Respondent hereby accepts and consents, without admitting or denying the findings, and solely for the purposes of this proceeding and any other proceeding brought by or on behalf of FINRA, or to which FINRA is a party, prior to a hearing and without an adjudication of any issue of law or fact, to the entry of the following findings by FINRA:

## BACKGROUND

HBOLIS has been a registered FINRA member since July 1, 1994. HBOLIS is a self-clearing broker-dealer that primarily operates as a day trading firm by facilitating direct market access to customers and to its proprietary traders. HBOLIS' principal place of business is in New York, New York, and the Firm has approximately 95 associated persons, including proprietary traders. Between January 1, 2009 and December 31, 2011 ("the review period"), the owners of HBOLIS, Steven Hold ("S. Hold") and his brother, were the Firm's President and Chief Executive Officer, respectively.

HBOLIS' primary business is providing a trading platform, trade software and trade execution, support and clearing services for day traders. Many traders using HBOLIS are located overseas in countries such as China, India, Russia, Ukraine and Poland. These foreign-based day traders typically trade through a non-broker-dealer entity that is owned and operated by the same owners of HBOLIS. These affiliated non-broker-dealer entities of HBOLIS, and the foreign day traders associated with them, are not registered with FINRA or the SEC.

1

During the review period, HBOLIS' largest account was Demostrate LLC ("Demostrate"), an entity owned and funded 100% by HBOLIS' principals. Trade Alpha Corporate, Ltd. ("Trade Alpha"), which was also 100% owned and funded by the principals of HBOLIS, was an affiliate of Demostrate and structured in a similar manner.

## OVERVIEW

During the review period, Demostrate, a day trading entity wholly owned and funded by HBOLIS' principals, was HBOLIS' largest and most active account. Demostrate was controlled by or under common control with, HBOLIS. Demostrate engaged traders and trading groups in various foreign countries, primarily China, to trade its capital utilizing different trading strategies.

During the review period, certain traders associated with Demostrate and/or Trade Alpha, utilizing a sponsored access relationship to connect with securities exchanges, engaged in manipulative trading activities, including spoofing, layering, wash trading, and pre-arranged trading. By virtue of this conduct, HBOLIS willfully violated Sections 9(a)(1) and 9(a)(2) of the Securities Exchange Act of 1934 (the "Exchange Act"), and also violated FINRA Rules 2020 and 2010 and NASD Rules 3310, IM-3310, and 3320 (prior to February 15, 2010), and FINRA Rules 5210, 5210.01, and 5220 (on and after February 15, 2010).

In addition, HBOLIS violated NASD Rules 3010(a) and (b) by failing to establish and maintain a supervisory system, including written procedures, to supervise the Firm's trading activity that was reasonably designed to achieve compliance with applicable federal securities laws and regulations, and FINRA Rules.

FINRA's anti-money laundering (AML) rule, FINRA Rule 3310,[1] requires firms to establish and implement policies, procedures, and internal controls that can reasonably be expected to detect and cause the reporting of suspicious transactions, including suspicious securities transactions, as required by the Bank Secrecy Act and the implementing regulations thereunder. During the review period, HBOLIS failed to establish and implement policies and procedures that reasonably could be expected to detect and cause the reporting of suspicious transactions in contravention of NASD Rule 3011(a) and FINRA Rules 3310(a) and 2010. As a result of HBOLIS' deficient AML program, HBOLIS failed to detect and report, as appropriate, numerous instances of manipulative and suspicious trading activity in the Trade Alpha and Demostrate accounts.

In July and September 2008, the Firm engaged in short sale trading in violation of the two Emergency Orders issued by the Securities & Exchange Commission ("SEC"). Further, the Firm failed to establish and maintain supervisory systems and procedures to ensure compliance with the two Emergency Orders. By the foregoing conduct the Firm violated Section 12(k) of the Exchange Act and NASD Rules 3010(a) and (b) and 2110.

During January 1, 2009 through December 31, 2009, the Firm's written supervisory procedures relating to Regulation SHO were deficient in that, among other things, they failed to

---

[1] Formerly NASD Rule 3011.

2

set forth adequate procedures to determine that: (1) sale orders were properly marked; (2) aggregation units were independently maintained and each engaged in separate trading strategies; and (3) close out requirements were met on all fail to deliver positions. By virtue of the foregoing, the Firm violated NASD Rule 3010(b) and FINRA Rule 2010.

From May 2009 through August 1, 2012, HBOLIS violated NASD Advertising Rules 2210(d)(1)(A) and (B) by means of various misleading, exaggerated and unwarranted statements on its HBOLIS website.  From at least May 2009 through December 2010, the Firm further violated NASD Rule 2210(d)(1)(B) and FINRA Rule 2010 by means of various misleading and confusing statements on the Xerxes Trading website of its Morristown, NJ branch office regarding the status of that branch office as a separate broker dealer and stand alone member of FINRA and SIPC.

During the course of FINRA's financial and operations reporting examination of HBOLIS in 2011, the Firm failed to respond timely and completely to FINRA's requests for documents and information, in violation of FINRA Rules 8210 and 2010.

Between January 1 and June 30, 2009, October 1 and December 31, 2010, and October 17, 2011 through April 18, 2012, HBOLIS failed to transmit to OATS Reportable Order Events ("ROEs") or transmitted to OATS ROEs that contained inaccurate, incomplete, or improperly formatted data in violation of FINRA Rule 7450.  In addition, the Firm failed to provide documentary evidence that it performed the supervisory reviews set forth in its written supervisory procedures concerning OATS reporting, in violation of NASD Rule 3010 and FINRA Rule 2010.

## FACTS AND VIOLATIVE CONDUCT

I. **HBOLIS and Its Common Control of Trade Alpha and Demostrate**

### A. HBOLIS' Structure And Business

HBOLIS' ownership structure is broken into two classes.  Class A Membership is owned by Hold Brothers, Inc., a corporation owned by HBOLIS' principals.  Class B Membership is owned by a group of proprietary traders registered with HBOLIS, including HBOLIS' principals.

Although HBOLIS is self-clearing, the Firm also has a sponsored access relationship[2] with another clearing firm, through which foreign traders utilize market participant identifiers ("MPID").  During the review period, HBOLIS had approximately 95 associated persons, including registered proprietary traders.

During the review period, HBOLIS had approximately 49 customer accounts, broken down into 217 different trader groups and 2,432 identified traders.  Demostrate was by far HBOLIS' largest account.  Approximately 90% (197) of the trader groups and 88% (2,160) of the identified traders were associated with the Demostrate account.

---

[2] Sponsored access refers to the practice in which a bank or brokerage firm offers a client direct market access to an exchange.

HBOLIS averaged approximately 400,000 trades per day, approximately 90% of which were placed through the Demostrate account.

## B. HBOLIS' Common Control of Trade Alpha, Demostrate and Their Traders

Demostrate is a foreign limited liability company organized in April 2009 in Nevis and St. Kitts and is 100% owned by HBOLIS' principals. Trade Alpha was also 100% owned by HBOLIS' principals. The Demostrate account was opened at HBOLIS on December 22, 2009. William Tobias, a registered representative with a HBOLIS affiliate and a non-registered fingerprint person with HBOLIS, was appointed as the managing member of Demostrate.

Demostrate was structured with various groups and locations of traders with various trading strategies, concentrated mainly in China. The Demostrate account was solely funded by HBOLIS' principals.

Recruitment of, and negotiation with, prospective traders and trader groups was largely handled on behalf of Demostrate by both recruiters employed by HBOLIS and by HBOLIS affiliates. Recruiters placed postings, approved by HBOLIS' Compliance Department, through online professional sites seeking individuals or groups interested in trading through direct access platforms. Recruiters were also responsible for negotiating rates with traders and trader groups, and for acting as a liaison between the prospective traders and groups and HBOLIS' IT, Compliance, Operations, Trade Support and Accounting groups.

Demostrate's traders and trader groups (referred to by HBOLIS as "Risk Groups") were compensated based upon a percentage of profits of trading Demostrate's capital. HBOLIS charged Demostrate $0.10/1,000 shares base rate plus expenses. After that, profits were generally split 85% to the Risk Group and 15% to the Demostrate account. HBOLIS' principals were responsible for authorizing the payouts to the Risk Groups. Each Risk Group was responsible for allocating profits to its individual traders. Although Demostrate assumed risk of loss for trading in the account, generally 10% of the Risk Group's 85% (capped at $10,000) was held in a reserve against losses in Demostrate Risk Groups.

Once a Demostrate trader was approved through the recruitment process, HBOLIS' trade support group assigned the trader a four digit alpha identifier. In some instances, traders had more than one identifier (for example, in order to trade two different trading strategies).

HBOLIS' Trade Support and Risk Management teams were responsible for establishing trader limits and buying power for the Trade Alpha and Demostrate traders. HBOLIS oversaw risk management of the traders to ensure traders were not taking undue risk with capital, and HBOLIS' Compliance Department was responsible for reviewing the trading activity of the Trade Alpha and Demostrate traders for improper or violative trading activities. HBOLIS' Compliance Department also had the authority to initiate disciplinary action against Trade Alpha and Demostrate traders, up to and including termination. In addition to the roles previously referenced, Tobias performed consulting services for HBOLIS.

Based upon the foregoing, Trade Alpha, Demostrate and their traders, were controlled by, or under common control with, HBOLIS.

4

## II.  Manipulative Trading Activities

During the review period, HBOLIS, through its affiliated entities, Trade Alpha and Demostrate, and utilizing a sponsored access relationship to connect with exchanges, engaged in manipulative trading activities, in violation of Sections 9(a)(1) and 9(a)(2) of the Exchange Act and FINRA Rules 2020 and 2010.

### A.  Spoofing and Layering

Among the manipulative trading activities utilized by certain of the Trade Alpha/Demostrate traders were spoofing and layering, including manipulative cross-market layering activities.   Generally, spoofing is a form of market manipulation which involves a market participant placing certain non-bona fide order(s), generally inside the existing National Best Bid or Offer ("NBBO"), with the intention of briefly triggering some type of market movement and/or response from another market participant, followed by cancellation of the non-bona fide order, and the entry of an order on the opposite side of the market.  Layering involves a trading pattern in which multiple, non-bona fide, limit orders are entered on one side of the market at various price levels away from the NBBO in order to create the appearance of a change in the levels of supply and demand, thereby artificially moving the price of the security.  An order is then executed on the opposite side of the market at the artificially created price, and the non-bona fide orders are immediately cancelled.

Throughout the review period, there were hundreds of instances of Trade Alpha/Demostrate traders engaging in spoofing and layering activities in order to profit by artificially manipulating the price of a security.  By way of example is the following spoofing activity used by Trade Alpha in order to induce the trading algorithm of an unaffiliated entity ("the Algo") to trade against Trade Alpha.

On March 23, 2009, in shares of XXX, a thinly traded stock, a Trade Alpha non-bona fide sell short order was entered inside the prevailing quote, which lowered the national best offer ("NBO").[3]   Thereafter, a Trade Alpha buy order was entered inside the prevailing quote, which raised the national best bid ("NBB").  Based upon this change in the market,  the Trade Alpha trader induced the Algo to sell to Trade Alpha at a price lower than where the market had been.  The Trade Alpha trader, then cancelled its original orders, and entered a new Trade Alpha sell short order, selling 100 shares at a profit of $.02 per share.

| Time | Event | Buy/sell | Volume | Price | NBB | NBO | Comment[4] |
|------|-------|----------|--------|-------|-----|-----|---------|
| 9:56:41 | order | sell short | 100 | 10.61 | 10.59 | 10.63 | order lowered NBO to 10.61 |
| 9:56:44 | order | buy | 300 | 10.60 | 10.59 | 10.61 | order raised NBB to 10.60 |
| 9:56:44 | trade | buy | 100 | 10.60 | 10.60 | 10.61 | trade vs. Algo |
| 9:56:45 | cancel | buy | 200 | 10.60 | 10.60 | 10.61 | Bid reverts to where it was at beginning of sequence. |

---

[3] Volume in XXX on March 23, 2009 was 71,500 shares, and traded in a range of $10.44 to $10.77.

[4] The effect of the order/trade cancellation on the NBBO is reflected in the row after the event.

| 9:56:45 | cancel | sell short | 100 | 10.61 | 10.59 | 10.61 | Offer reverts to where it was at beginning of sequence. Sell short was entered to lower the offer, inducing purchase at lower price. |
| 9:56:52 | order | sell short | 300 | 10.62 | 10.61 | 10.63 | order lowered NBO to 10.62 |
| 9:56:53 | trade | sell short | 100 | 10.62 | 10.61 | 10.62 | trade vs. Algo |
| 9:56:54 | cancel | sell short | 200 | 10.62 | 10.61 | 10.62 | |

Such pattern of placing small limit orders for thinly traded stocks within the NBBO was done for the purpose of artificially narrowing the NBBO, and allowed the Trade Alpha trader to take advantage of his artificially narrowed quote. The Trade Alpha traders, induced the Algo to repeatedly sell securities to Trade Alpha, and then triggered the Algo to buy them back from Trade Alpha at a higher price.

An example of certain Demostrate traders' manipulative cross-market layering activity occurred on June 4, 2010. On this date, a Demostrate trader entered an order to sell short ("bona fide order") on a non-primary listing market for the subject security, while entering multiple buy orders, at progressively higher prices ("non-bona fide orders") on the security's primary listing market. The bona fide order displayed 100 shares with the remainder in reserve, and thus was undetectable to other market participants. The non-bona fide orders, all fully displayed, impacted the National Best Bid price by creating the appearance of increasing buy interest. This induced the execution of the bona fide sell short order on the non-primary listing market, including the majority of the shares in reserve. After the order was executed, the non-bona fide buy orders submitted to the primary listing market were immediately cancelled, unexecuted.

| Time | Activity |
| --- | --- |
| 11:08:32.596 | The NBBO was $101.24 - $101.35 |
| 11:08:33.063 | An order to sell short 1,000 shares ("bona fide order"), displaying 100 shares with 900 shares in reserve, was sent to the non-primary listing market at a price of $101.32. |
| 11:08:33.065 | The NBBO became $101.24 - $101.32. |
| 11:08:33.071 - 11:08:33.172 | Demostrate sent five buy orders ("non-bona fide orders"), totaling 2,000 shares at progressively higher price levels, ranging in price from $101.27 to $101.31, to the primary listing market. Each order established a new National Best Bid immediately after its entry on primary listing market. |
| 11:08:33.173 - 11:08:33.176 | Buying Algo, through seven transactions, partially executed against the bona fide 1,000-share sell short order. Buying Algo executed a total of 645 shares at a price of $101.32 against Demostrate's bona fide order. |
| 11:08:33.180 - 11:08:33.233 | Demostrate sent six additional non-bona fide buy orders, totaling 600 shares, to the primary listing market, all priced at $101.31. |
| 11:08:33.233 | Buying Algo partially executed additional 200 shares at $101.32 against Demostrate's 1,000 share sell short bona fide order. |
| 11:08:33.838 - 11:08:33.882 | The remaining 155 shares of the 1,000 share bona fide sell short order were cancelled and all eleven non-bona fide buy orders sent to the primary listing market were cancelled. |

6

| Time | Activity |
|------|----------|
| 11:08:33.883 | The NBBO returned to the pre-layering price levels of $101.24 - $101.35. |

This layering activity resulted in the Demostrate trader selling 845 shares at a price $0.08 higher than would otherwise have been available in the absence of the layering activity.

Five seconds later, the Demostrate trader, using the direct access provided by HBOLIS, reversed sides of the market using the same pattern of layering by entering a bona fide buy order with reserve size on the same non-primary listing market and a series of non-bona fide sell short orders on the primary listing market. The non-bona fide sell short orders artificially depressed the National Best Offer, creating the artificial appearance of sell-side pressure, which enticed the Selling Algo to execute against the Demostrate trader's bona fide buy order at a price lower than would otherwise have been available in the absence of the layering activity. Demostrate traders, through repetitive layering, alternately executed on the buy and sell side of the market and received favorable execution pricing that would otherwise have been unavailable in the absence of its layering activity.

### B. Wash Trading[5]

In thousands of instances during the review period, a particular Trade Alpha or Demostrate Risk Group, as well as a specific Trade Alpha or Demostrate trader, were on both sides of a transaction, buying and selling the same security, on the same day, at the same time and price. For example, on March 3, 2010, a Demostrate trader bought and sold the same stock at the same time and same price 61 times. The next day, he turned around and bought and sold the same stock at the same time and same price another 66 times.

### C. Pre-arranged Trading[6]

Similarly, certain Trade Alpha and Demostrate traders engaged in pre-arranged trading activities. For example, in a dozen instances between April 13, 2009 and May 1, 2009, a Trade Alpha trader, through the Firm, engaged in a pattern of trading in nine stocks, entering a series of transactions in which he pre-arranged with a trader at another firm to take the opposite side of the transactions. In these pre-arranged transactions, the Trade Alpha trader entered a short sale (buy), and then several seconds later he entered a buy (sell) for the same position at a lower (higher) price. He then repeated this process.

Based on the foregoing conduct, HBOLIS, through certain Trade Alpha and Demostrate traders, directly or indirectly, for the purpose of creating a false or misleading appearance of active trading in securities registered on a national securities exchange: (i) effected transactions which involved no change in the beneficial ownership thereof; (ii) entered orders for the purchase (sale) of securities with the knowledge that orders of substantially the same size, at

---

[5] Wash trading involves the execution of a securities transaction which involves no change in the beneficial ownership of the security. Wash trades may be inadvertent or may be attributable to an improper purpose such as the intentional manipulation of trading volume or market prices.

[6] While wash trading is the execution of a securities transaction which involves no change in the beneficial ownership of the security, pre-arranged trading is an offer to sell coupled with an offer to buy back at the same or at a pre-determined price, and may involve a change in beneficial ownership.

substantially the same time, and at substantially the same price, for the sale (purchase) of such security, had been or would be entered by or for the same or different parties; and (iii) effected a series of transactions in securities to create actual or apparent active trading in such securities, or raising or depressing the price of such securities, for the purpose of inducing the purchase or sale of such securities by others, in willful violation of Section 9(a)(1) and 9(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act").  Such conduct also violated FINRA Rule 2020 by effecting transactions in, or inducing the purchase or sale of securities by means of a manipulative, deceptive or other fraudulent device or contrivance.

In addition, HBOLIS violated NASD Rules 3310 and IM-3310 (before February 15, 2010) and FINRA Rules 5210 and 5210.01 (on and after February 15, 2010) by: (i) publishing or causing to be published transactions as a purchase or sale of securities without the belief that such transaction was a bona fide purchase or sale of such security; and (ii) purporting to quote the bid or asked price for securities, without the belief that such quotation represented a bona fide bid for, or offer of, such security.  HBOLIS violated NASD Rule IM-3310 and FINRA Rule 5210.01 by publishing quotations "without having reasonable cause to believe that such quotation [was] a bona fide quotation, [was] not fictitious and [was] not published or circulated or caused to be published or circulated for any fraudulent, deceptive or manipulative purpose."

HBOLIS violated NASD Rule 3320 (before February 15, 2010) and FINRA Rule 5220 (on and after February 15, 2010) by making an offer to buy or sell a security at a stated price without being prepared to purchase or sell at such price and under such conditions as are stated at the time of such offer to buy or sell.

HBOLIS also violated FINRA Rule 2010 by failing to observe high standards of commercial honor and just and equitable principles of trade in the conduct of its business.

### D. HBOLIS Failed To Adequately Supervise Its Trading Activities

NASD Rule 3010(a) requires firms to establish and maintain a supervisory system, including written procedures, to supervise its registered and associated persons that is reasonably designed to achieve compliance with applicable securities laws and regulations, and FINRA rules.  Rule 3010(b) requires that each firm establish, maintain, and enforce written supervisory procedures to supervise the types of business in which it engages that are reasonably designed to achieve compliance with applicable securities laws and regulations, and FINRA Rules.

During the review period, HBOLIS failed to have a system and written procedures that were reasonably designed to supervise its primary business of providing a trading platform, trade software and trade execution, support and clearing services for day traders.  The Firm averaged approximately 400,000 trades per day.  Prior to February 2010, the Firm did not have a supervisory system or procedures designed to adequately monitor for layering or spoofing activity.  Throughout the review period, the Firm's supervisory system and procedures were not reasonably designed to monitor its high volume of daily trading for manipulative trading activity, such as spoofing, layering, wash trading and pre-arranged trading.  As a result, HBOLIS violated NASD Rules 3010(a) and (b).

### III.   Anti-Money Laundering Violations

FINRA Rule 3310, (formerly NASD Conduct Rule 3011)[7] requires all member firms to "develop and implement a written anti-money laundering program reasonably designed to achieve and monitor the firm's compliance with the requirements of the Bank Secrecy Act (31 U.S.C. § 5311, *et seq.*), and the implementing regulations promulgated thereunder by the Department of the Treasury."

Title 31 U.S.C. § 5318(g) authorizes the United States Department of the Treasury to issue suspicious activity reporting requirements for broker-dealers. The Treasury Department issued the implementing regulation, 31 C.F.R., § 103. 19(a)(1), on July 1, 2002. It provided that, with respect to any transaction after December 30, 2002, "[e]very broker or dealer in securities within the United States . . . shall file with FinCEN . . . a report of any suspicious transaction relevant to a possible violation of law or regulation." Section (a)(2) of that regulation specifically provides:

> A transaction requires reporting . . . if it is conducted or attempted by, at, or through a broker-dealer, it involves or aggregates funds or other assets of at least $5,000, and the broker-dealer knows, suspects, or has reason to suspect that the transaction (or a pattern of transactions of which the transaction is a part):
>
> (i)     Involves funds derived from illegal activity or is intended or conducted in order to hide or disguise funds or assets derived from illegal activity (including, without limitation, the ownership, nature, source, location, or control of such funds or assets) as part of a plan to violate or evade any federal law or regulation or to avoid any transaction reporting requirement under federal law or regulation;
>
> (ii)    Is designed, whether through structuring or other means, to evade any requirements of this part or of any other regulations promulgated under the Bank Secrecy Act, . . . ;
>
> (iii)   Has no business or apparent lawful purpose or is not the sort in which the particular customer would normally be expected to engage, and the broker-dealer knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction; or
>
> (iv)    Involves use of the broker-dealer to facilitate criminal activity.

In April 2002, FINRA issued Notice to Members ("NTM") 02-21, which reminded broker-dealers that by April 24, 2002, they were required to establish and implement AML programs designed to achieve compliance with the Bank Secrecy Act and the regulations

---

[7] On January 1, 2010, FINRA Rule 3310, FINRA's AML program rule, went into effect and replaced NASD Rule 3011.

promulgated thereunder. The Notice further advised broker-dealers that their AML procedures must address a number of areas including monitoring of account activities, "including but not limited to, trading and the flow of money into and out of accounts."

In August 2002, FINRA issued NTM 02-47, which set forth the suspicious activity reporting rule promulgated by the United States Department of the Treasury for the securities industry. This NTM further reminded broker-dealers of their duty to file a SAR-SF (Suspicious Activity Reports for the Securities and Futures Industry) for any suspicious transactions occurring after December 30, 2002.

## A. HBOLIS' Inadequate AML Procedures

HBOLIS' AML system and procedures, largely modeled after the small firm template in effect prior to 2010,[8] were memorialized as part of the Firm's written supervisory procedures. The Firm's AML Compliance Officer (AMLCO) was responsible for "monitoring the Firm's AML compliance and overseeing communication and training for employees." The AML procedures did not specify any further duties of the AMLCO, and did not identify any other Firm employees as having any supervisory responsibilities for monitoring for suspicious activity.

In terms of monitoring for suspicious activity, the AML procedures provided that "[t]he Firm will manually monitor a sufficient amount of account activity to permit identification of patterns of unusual size, volume, pattern or type of transactions, geographic factors." The red flags identified focused on suspicious activity in the account opening process or suspicious activity related to money movement, but not on any trading activity. Other than manual monitoring of accounts, the AML procedures did not identify any particular reports or tools to be used, automated or otherwise, to detect any suspicious trading activity in accounts. The AML procedures also did not identify who was responsible for performing the reviews, what specifically was to be reviewed, how often the reviews were to be performed, and how the reviews were to be evidenced.

Although HBOLIS had AML policies and procedures in place during the review period, they could not reasonably be expected to detect and cause the reporting of suspicious transactions as required by NASD Rule 3011(a) and FINRA Rule 3310(a). The written AML procedures themselves did not detail any specific steps to be taken by anyone at the Firm in order to monitor for or detect any suspicious or manipulative trading activity, nor did they outline any red flags in connection with trading activity. Especially in light of HBOLIS' business model of providing direct market access to customer accounts traded by traders in foreign countries, it was unreasonable for HBOLIS to not have more detailed procedures in place to monitor for suspicious or manipulative trading activity.

## B. HBOLIS' Inadequate Internal Controls For Detecting Suspicious Trading Activity

During the review period, HBOLIS monitored for suspicious money movement and suspicious stock movement through a weekly review of an automated SIS-Broadbridge

---

[8] *See* http://www.finra.org/Industry/Issues/AML/p006340.

generated report.   All money movement in excess of $3,000 was reviewed, and money movement in excess of $100,000 was reported to senior management.  Stock movement that was not between the same customer's accounts at HBOLIS or another broker-dealer was required to be completed via DTCC.   The Firm's AMLCO, reviewed these and other reports in order to monitor for and detect suspicious money movement in and out of accounts.   However, the AMLCO did not perform any reviews related to suspicious *trading* activity.

It was not until April of 2010 when HBOLIS began to design and implement reports to monitor for or detect suspicious trading activity.   In April 2010, HBOLIS implemented two automated reports for purposes of monitoring for certain types of suspicious trading activity.  The first report was a Wash Sale Violation report, which identified executions at the same time and price by the same customer.  The second report was a Thinly Traded Report, implemented to identify cross trades and spoofing.  In or around July 2010, after being notified by FINRA of suspected manipulative trading activity in the Demostrate account, HBOLIS started to develop a Layering Report designed to examine the ratio of excessive number of cancels to orders entered for indications of an individual entering non-bona fide orders.  The Firm had no other tools or reports, automated or otherwise, to monitor for potentially suspicious trading activity.

During the majority of the review period, HBOLIS did not have any internal controls in place that were reasonably designed to achieve compliance with the Bank Secrecy Act.  One of the factors that FINRA has instructed members to consider when tailoring procedures and systems to the business conducted is the "technological environment in which the firm operates."[9]   Firms such as HBOLIS have specifically been instructed to "consider conducting computerized surveillance of account activity to detect suspicious transactions and activity."[10]  The Firm failed to adopt a risk-based approach in designing and implementing its AML procedures and controls by failing to have in place automated reports or other surveillance to adequately monitor for and detect suspicious trading activity.  HBOLIS' AML procedures in effect during the review period provided that the Firm would "manually review" trading activity for suspicious activity.   The very large volume of trades executed by HBOLIS every day (approximately 400,000 per day) made this approach unreasonable and ineffective.

## C. HBOLIS' Failure to Detect and Report Suspicious Trading Activity

As a result of HBOLIS' deficient AML procedures and internal controls, numerous red flags indicative of suspicious trading activity were not detected, investigated, or reported.  In fact, the Firm failed to detect significant suspicious trading in the Demostrate account during the review period.   That activity involved patterns of spoofing, layering, pre-arranged trading, and wash trading.

There were numerous instances when the Firm's Compliance Department determined that Demostrate's traders had engaged in "suspicious" or manipulative trading.  In those instances, the Firm's general process was to discipline the Demostrate trader by issuing a warning for the first occurrence, followed by suspending the traders' trading privileges for the second violation, and finally terminating the trader's trading privileges for a third violation.  In every instance

---

[9] NASD Notice to Members 99-45, *NASD Provides Guidance On Supervisory Responsibilities*, at 2.

[10] *Id.* at 7.

where suspicious trading activity by a Demostrate trader was identified, the profits generated by the trading were maintained by either the Firm or the Demostrate account. These instances of suspicious activity were never escalated or otherwise discussed with HBOLIS' AMLCO and the Firm failed to consider whether a SAR-SF filing was warranted to report this activity.

For example, on June 5, 2009, NYSE Arca notified HBOLIS that it had detected wash trading activity by a Trade Alpha trader between April 13 and May 1, 2009. Specifically, on twelve instances, the trader engaged in a pattern of trading in nine stocks, in which he entered a short sale (buy), and then several seconds later he entered a matching buy (sell) to maintain the same position at a lower (higher) price  He then repeated the process. After the trader admitted to HBOLIS (through Demostrate) that the trades were prearranged, HBOLIS terminated the trader's trading authorization, but never even considered whether it was necessary to file a SAR-SF.

Similarly, on February 2, 2010, NYSE Arca notified HBOLIS that it had detected 19 transactions on January 10, 2010, in which Demostrate was on both sides of the trades of 20,000 shares of TAMB. All of the trading took place between two Demostrate traders who worked in the same Risk Group. HBOLIS notified Arca that after the matter was bought to its attention, it suspended the two traders, but again, failed to even consider whether to file a SAR-SF.

By virtue of the above, during the review period, HBOLIS violated NASD Rules 3011(a) and FINRA Rules 3310(a) and 2010 by failing to establish and implement policies and procedures that could reasonably be expected to detect and cause the reporting of suspicious transactions required under 31 U.S.C. § 5318(g) and the implementing regulations thereunder.

## IV.     Regulation SHO and Related Violations

### A. HBOLIS Failed to Comply with the SEC Emergency Orders

On July 15, 2008, the Securities & Exchange Commission ("SEC") issued an emergency order ("Emergency Order I").[11] Emergency Order I provided, in pertinent part that no person could effect a short sale in the publicly traded securities of certain "Substantial Financial Firms" unless such person or its agent borrowed or arranged to borrow the security or otherwise had the security available to borrow in its inventory prior to effecting such short sale. An appendix to Emergency Order I specifically identified 19 financial firms as "Substantial Financial Firms."

Emergency Order I was effective on July 21, 2008 through July 29, 2008. On July 29, 2008, the SEC amended Emergency Order I to extend its effective period through August 12, 2008.

During the period July 21, 2008 through August 12 2008, HBOLIS effected approximately 3,600 proprietary short sales in the securities of 14 Substantial Financial Firms identified in Emergency Order I without having borrowed or arranged to borrow the security or otherwise having the security available to borrow in its inventory prior to effecting such short

---

[11] *See* Exchange Act Rel. No. 58166, as amended by Exchange Act Rel. No. 58190 (July 18, 2008) and Exchange Act Rel. No. 58248 (July 29, 2008).

sales. The foregoing resulted in approximately 7,680 short sale executions and over 2.1 million executed shares violative of Emergency Order I.

The SEC issued Emergency Order II on September 18, 2008.[12] Emergency Order II provided, among other things, that "all persons are prohibited from short selling any publicly traded securities of any "Included Financial Firm." An appendix to Emergency Order II specifically identified 799 financial firms as "Included Financial Firms." Emergency Order II was effective on September 19, 2008 through October 8, 2008.

During the period September 19, 2008 through October 8, 2008, HBOLIS effected approximately 10,900 proprietary short sales in the securities of 166 Included Financial Firms identified in Emergency Order II.[13] The foregoing resulted in approximately 16,500 executions and over 4.2 million executed shares violative of Emergency Order II.

Both Emergency Order I and Emergency Order II had been promulgated by the SEC pursuant to authority granted it under Section 12 of the Exchange Act. Based upon the foregoing conduct, the Firm violated Section 12(k) of the Exchange Act by effecting short sales in the securities of Substantial Financial Firms without having borrowed or pre-borrowed the securities, and by effecting short sales in the securities of Included Financial Firms. This violative conduct also constitutes a violation of NASD Rule 2110.

### B.   HBOLIS' Supervisory System Was Not Reasonably Designed To Ensure Compliance with the SEC Emergency Orders

At no time during the effective dates of Emergency Orders I and II (collectively, the "Emergency Order Period") did the Firm establish or maintain a system reasonably designed to supervise its activities for compliance with Emergency Orders I and II. In addition, the Firm's written supervisory policies and procedures were not updated or otherwise amended to comply with Emergency Orders I and II.

The Firm failed to put in place policies and procedures regarding Emergency Orders I and II or otherwise formally communicate to its traders the requirements of the emergency orders or direct their actions with respect to the trading constraints the emergency orders imposed. The Firm also failed to establish policies and procedures to direct its supervisory principal on the method and manner in which supervision of the emergency orders should be carried out.

During the Emergency Order Period, the Firm maintained two front-end systems — a proprietary system called Graybox and one which they contracted for with a non-affiliated vendor called Sterling Trader Pro ("Sterling"). The Firm attempted to block short sales in the securities of Substantial Financial Firms for Emergency Order I and Included Financial Firms on

---

[12] *See* Exchange Act Rel. No. 58592, as amended by Exchange Act Rel. No. 58611 (Sept 21, 2008); Exchange Act Rel. No. 58723 (Oct. 2, 2008).

[13] Emergency Order II provided several exemptions from the requirements of the order. However, HBOLIS represented that they did not rely on any of the exemptions provided in connection with the short sales it entered during the period when Emergency Order II was in effect.

Emergency Order II (collectively, the "Restricted Securities") in Graybox and Sterling. However, due to human error in preparing and updating the list of Restricted Securities uploaded into Graybox and the system's software and programming failures, many short sales in Restricted Securities were not blocked. The Firm also failed to establish and maintain a supervisory system that allowed for the reasonable supervision of traders who were able to manually override short sale blocks that were successfully programmed into Graybox. Delays in communicating, updating and uploading the list of Restricted Securities in Sterling resulted in additional violative short sales.

The Firm also permitted certain traders to use a front-end trading system provided by a non-affiliated vendor with whom the Firm did not have a contract. The Firm therefore lacked the contractual authority to request and/or control any systems blocks relative to orders entered in that system, which failed to block short sales in some of the Restricted Securities and resulted in the placement and execution of short sales violative of the emergency orders.

Based on the foregoing, HBOLIS violated NASD Rule 3010(a) by failing to establish and maintain a system to supervise and NASD Rule 3010(b) by failing to establish, maintain, and enforce written procedures to supervise for compliance with Emergency Orders I and II. The foregoing also violated NASD Rule 2110.

### C.  Additional Regulation SHO Supervisory Violations

During at least January 1, 2009 through December 31, 2009, the Firm's written supervisory procedures relating to Regulation SHO were deficient in that, among other things, they failed to set forth adequate procedures to determine that: (1) sale orders were properly marked; (2) aggregation units were independently maintained and each engaged in separate trading strategies; and (3) close out requirements are met on all fail to deliver positions.

Effective September 7, 2004, the SEC adopted 17 CFR Part 242 ("Regulation SHO") under the Exchange Act and designated January 3, 2005 as the commencement date for compliance. Regulation SHO was, among other things, designed to control the harmful effects on market prices and the volatility caused by naked short selling. With this primary goal in mind, Regulation SHO was designed to: (i) create uniform order marking requirements for sales of equity securities; (ii) reduce the number of potential failures to deliver (hereinafter referred to as a "fail' or "fail to deliver") by means of "locate" requirements; and (iii) limit the time in which a broker dealer can permit a fail to deliver to persist for securities on the various SRO threshold securities lists.

As effected, Rule 200(g) of Regulation SHO required that a broker or dealer mark all sale orders of any equity security as "long," "short" or "short exempt." The accurate marking of sale orders is essential for locate, stock borrow, reporting, record keeping and execution purposes.

Rule 200(f) of Regulation SHO states that:

> In order to determine its net position, a broker or dealer shall aggregate all of its positions in a security unless it qualifies for independent trading unit aggregation, in which case each independent

14

trading unit shall aggregate all of its positions in a security to determine its net position. Independent trading unit aggregation is available only if: (1) the broker-dealer has a written plan of organization that identifies each aggregation unit, specifies its trading objective(s), and supports its independent identity; (2) each aggregation unit within the firm determines, at the time of each sale, its net position for every security that it trades; (3) all traders in an aggregation unit pursue only the particular trading objective(s) or strategy(s) of that aggregation unit and do not coordinate that strategy with any other aggregation unit; and (4) individual traders are assigned to only one aggregation unit at a time.

Regulation SHO Rule 204 requires broker-dealers to close out any failed settlement that exists on settlement date (T+3) by the opening of trading on T+4 (in the case of short sales) and T+6 (in the case of long sales).

The Firm's procedures lacked any description of the process by which Firm orders were marked long or short. Consequently, orders entered through Sterling were not being marked correctly. For example, a review of the execution blotter of customer ABC for trade date October 20, 2009 disclosed that the customer was long the shares of security XYZ. Despite the foregoing, subsequent sales of security XYZ continued to be marked by the Firm as short sales.

In addition, the Firm's procedures failed to describe its process for determining proprietary and customer positions in securities on an individual basis. Specifically, the Firm lacked a written plan of organization identifying each separate aggregation unit, specifying its trading objective(s) and supporting its independent identity. Moreover, the Firm was unable to evidence that each trader in each aggregation unit was pursuing only the trading objectives or strategies of that aggregation unit; was not coordinating that strategy with any other aggregation unit; and was only assigned to one aggregation unit.

Further, the Firm's procedures did not describe the fail to deliver requirements of Regulation SHO's Rule 204 and the Firm indicated it was unaware of the CNS fail to deliver close out requirements imposed by that rule. A review of a sample of 10 CNS fail to deliver positions on the Firm's books for the period May 1 through June 2, 2009 disclosed that the Firm failed to close out the CNS fail to deliver in all 10 positions.

Based on the foregoing, HBOLIS violated NASD Rule 3010(b) by failing to establish, maintain, and enforce adequate written procedures to supervise for compliance with Regulation SHO. The foregoing also violated FINRA Rule 2010.

## V.    Advertising Violations

From at least May 2009 through August 1, 2012, HBOLIS maintained a website marketing its services. From in or about October 2005 to December 2010, HBOLIS had a branch office located in Morristown, NJ, which was an Office of Supervisory Jurisdiction of HBOLIS. The Morristown, NJ HBOLIS branch office conducted business and marketed itself under the name Xerxes Trading and maintained its own website under that name. The Firm is responsible for ensuring that advertisements appearing on either its own website or those of its branch office, Xerxes Trading, are in compliance with NASD Rules.

NASD Rules 2210(d)(1)(A) & (B) govern the substantive communications for advertisements and sales literature. Pursuant to NASD Rule 2210(d)(1)(A), all member communications with the public must be "based on principles of fair dealing and good faith, must be fair and balanced, and must provide a sound basis for evaluating facts in regard to any particular security or type of security..." NASD Rule 2210(d)(1)(B) states in pertinent part that, "no member may make any false, exaggerated, unwarranted or misleading statement or claim in any communication with the public."

### A.  The HBOLIS Website

Much of HBOLIS' website was dedicated to the Firm's "Graybox" technology and a significant amount of discussion concerned the speed and effectiveness of the Graybox trading platform. While the website included the statement, "Systems response times may vary due to a variety of factors, including trading volume, market conditions and system performance," the disclaimer was separated from the Firm's claims of speed and effectiveness in a subsection of a "Risk Disclosure" section entitled, "Volatility." The disclaimer's lack of prominence and low visibility failed to provide the reader with a sound basis for evaluating some considerations associated with day-trading and the use of the platform.

HBOLIS' website also contained numerous exaggerated and unwarranted statements. For example, references to Graybox software as being "industry leading;" "winner of the software wars of the 90s;" and providing "the split second execution advantage that can spell out the difference between profit and loss" were unwarranted.

The HBOLIS website also contained a repeated and prominent statement that HBOLIS is the "only direct access trading firm on the Inc. 500 list of America's fastest growing companies." However, the website failed to disclose that the Firm had to pay a fee to be considered for a ranking and that the Firm was ranked only in 2000 and 2001. The foregoing renders the Firm's statement irrelevant, exaggerated, and misleading. Despite being notified by FINRA's Advertising Regulation Department that this statement without the disclosure violated FINRA's advertising rules, the Firm did not remove it from its website, where it continued to appear as of August 1, 2012.

Based on the foregoing, HBOLIS violated NASD Rules 2210(d)(1)(A) & (B) and FINRA Rule 2010 by making misleading, unwarranted and exaggerated statements on its website.

### B. The Xerxes Trading Website

Statements contained on the Xerxes Trading website either stated or implied that Xerxes Trading was a FINRA member. Xerxes Trading was not a member of FINRA nor a registered broker-dealer. The Xerxes Trading website further suggested that HBOLIS' broker dealer functions were those of Xerxes. Examples are noted below:

- [Xerxes] is a "Proprietary Equity Trading Firm;"
- "We are a member of FINRA and SIPC;"
- "Join an established trading firm that has been in business since 1994;"
- "Will sponsor for Series 7, Series 55, and Series 63 and trade firm's capital;" and
- "Learn Xerxes Trading strategies"

The foregoing statements caused significant confusion regarding the relationship between Xerxes Trading and HBOLIS and misleadingly attribute features and services of the broker dealer HBOLIS to Xerxes Trading.

Based on the foregoing, HBOLIS violated NASD Rule 2210(d)(1)(B) and FINRA Rule 2010 by not preventing the making of misleading statements on the Xerxes Trading website.

## VI.    Failure To Cooperate

In the course of conducting its financial and operations reporting examination of HBOLIS during 2011, FINRA sought to obtain certain documents from the Firm on several occasions. The Firm failed to comply with these requests in a complete and timely manner.

Specifically, on August 1, 2011, FINRA examination staff issued HBOLIS a written request pursuant to FINRA Rule 8210 for certain documents (the "Initial Records Request"). The Initial Records Request instructed HBOLIS to make the requested documents available for review at the Firm upon commencement of the onsite exam and specified that, if any of the requested documents would not be available for review on August 8, 2011, HBOLIS was to notify FINRA prior to August 8, 2011. The Initial Records Request included, among other records, a signed FOCUS report including all supporting work papers and documentation for the capital period ending May 30, 2011.

Although HBOLIS did not notify FINRA that any of the requested documents would not be available for review, when the FINRA examiners arrived at HBOLIS to commence the onsite examination on August 8, 2011, only a portion of the records listed in the Initial Records Request were available for review. In particular, the supporting work papers and documentation requested for the May 31, 2011 FOCUS report were not produced. FINRA staff issued written follow-up requests for the records that had not been produced on October 27, 2011, October 31, 2011 and November 3, 2011. HBOLIS continued to fail to produce a complete and adequate response to these requests.

Also, between October 18, 2011 and November 8, 2011, FINRA examination staff requested additional documents and information from HBOLIS. FINRA examination staff repeatedly requested to meet with HBOLIS personnel to explain certain adjustments made by the Firm on its May 31, 2011 FOCUS Report. Meetings were confirmed and then cancelled by

HBOLIS. Despite making follow-up requests and extending HBOLIS' time to respond, the Firm provided only partial but incomplete responses to the document requests.

On November 11, 2011, FINRA issued another written request itemizing each and every previous request made by the FINRA examination staff during the 2011 FinOp Exam that remained outstanding, and provided a deadline of November 18, 2011 for response. On November 18, 2011, HBOLIS contacted FINRA to request an extension of time for the response until November 21, 2011. The extension was granted. However, on November 21, only a partial response was received.

On November 23, 2011, FINRA issued a written Wells notice to HBOLIS indicating that FINRA's Enforcement Department had made a preliminary determination to recommend that disciplinary action be brought against the Firm for failing to provide timely and adequate responses to requests by FINRA staff for information and documentation pertaining to the 2011 FinOp Exam. The Wells notice required a response by December 7, 2011. It was not until December 1, 2011, after receiving FINRA's Wells notice, that HBOLIS completed its response to FINRA's August 1, 2011 written request for documents.

By failing to respond timely and completely to FINRA's requests, HBOLIS violated FINRA Rules 8210 and 2010.

## VII.   OATS Violations

Between January 1 and June 30, 2009, HBOLIS failed to transmit 2,166,646 Reportable Order Events ("ROEs") to OATS on 65 business days. These 2,166,646 ROEs represented 15 percent of all ROEs (14,174,685) that the Firm was required to transmit to OATS during the time period.

Between October 1 and December 31, 2010, the Firm transmitted to OATS 182,775 ROEs that were rejected by OATS for context or syntax errors and were repairable. The Firm failed to repair 146,775 of these rejected ROEs during this time period, representing 80 percent of all rejected repairable ROEs. As a result of the Firm's failure to repair these ROEs, the Firm failed to transmit 146,775 ROEs to OATS during the 4Q2010 review period.

Between October 17, 2011 and April 18, 2012, the Firm transmitted to OATS 2,401,792 reports that contained inaccurate, incomplete, or improperly formatted data. Specifically, the Route Reports contained inaccurate destination codes. These inaccurate and/or incomplete reports represented 11 percent of all reports (21,352,663) that the Firm transmitted to OATS during this time period.

The conduct described above constitutes separate and distinct violations of FINRA Rule 7450.

HBOLIS failed to provide documentary evidence that between January 1 and June 30, 2009, October 1 and December 31, 2010, and October 17, 2011 through April 18, 2012, it performed the supervisory reviews set forth in its written supervisory procedures concerning

OATS reporting. The conduct described in this paragraph constitutes violations of FINRA Rule 2010 and NASD Rule 3010.

B.   Respondent also consents to the imposition, at a maximum, of the following sanctions:

1. a censure;

2. a fine in the amount of $5,916,667, of which $2,516,667 will be paid by HBOLIS to the U.S. Securities and Exchange Commission (SEC) as a disgorgement and fine according to an Administrative Order issued by the SEC relating to its investigation of HBOLIS, Demostrate, and three individual senior managers associated with HBOLIS.[14] The remaining $3.4 million of the fine shall be paid jointly to FINRA, The NASDAQ Stock Market LLC, NASDAQ OMX BX, Inc., BATS Exchange, Inc., and NYSE Arca, Inc., of which $900,000 shall be paid to FINRA; and

3. HBOLIS shall further undertake to:

   a. Retain, within 60 days of the date of Notice of Acceptance of this AWC, an Independent Consultant, not unacceptable to FINRA staff, to conduct a comprehensive review of the adequacy of the Firm's policies, systems and procedures (written and otherwise) and training relating to anti-money laundering, trading, sponsored access, direct market access, day trading, compliance with SEC Rule 15c3-5, and the use of foreign traders.

   b. Exclusively bear all costs, including compensation and expenses, associated with the retention of the Independent Consultant.

   c. Cooperate with the Independent Consultant in all respects, including by providing staff support. HBOLIS shall place no restrictions on the Independent Consultant's communications with FINRA staff and, upon request, shall make available to FINRA staff any and all communications between the Independent Consultant and the Firm and documents reviewed by the Independent Consultant in connection with his or her engagement. Once retained, HBOLIS shall not terminate the relationship with the Independent Consultant without the FINRA staff's written approval; HBOLIS shall not be in and shall not have an attorney-client relationship with the Independent Consultant and shall not seek to invoke the attorney client privilege or other doctrine or privilege to prevent the Independent Consultant from transmitting any information, reports or

---

[14] In entering into this AWC, FINRA also took into consideration the charges brought by the SEC and the sanctions it imposed against HBOLIS, Demostrate, S. Hold, Robert Vallone (HBOLIS's Chief Compliance Officer), and William Tobias (of Trade Alpha and the managing member of Demostrate) in its related proceeding. In the SEC's action, the three individual senior managers associated with HBOLIS and/or Demostrate were barred from the securities industry and fined.

documents to FINRA.

d. At the conclusion of the review, which shall be no more than 160 days after the date of Notice of Acceptance of this AWC, require the Independent Consultant to submit to the Firm and FINRA staff an Initial Report. The Written Report shall address, at a minimum, (i) the adequacy of the Firm's policies, systems, procedures and training relating to anti-money laundering, trading, sponsored access, direct market access, day trading, compliance with SEC Rule 15c3-5, and the use of foreign traders; (ii) a description of the review performed and the conclusions reached, and (iii) the Independent Consultant's recommendations for modifications and additions to the Firm's policies, systems, procedures and training; and

e. Require the Independent Consultant to enter into a written agreement that provides that for the period of engagement and for a period of two years from completion of the engagement, the Independent Consultant shall not enter into any other employment, consultant, attorney-client, auditing or other professional relationship with HBOLIS, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. Any firm with which the Independent Consultant is affiliated in performing his or her duties pursuant to this AWC shall not, without prior written consent of the FINRA staff, enter into any employment, consultant, attorney-client, auditing or other professional relationship with HBOLIS or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

f. Within 90 days after delivery of the Written Report, HBOLIS shall adopt and implement the recommendations of the Independent Consultant or, if it determines that a recommendation is unduly burdensome or impractical, propose an alternative procedure to the Independent Consultant designed to achieve the same objective. The Firm shall submit such proposed alternatives in writing simultaneously to the Independent Consultant and the FINRA staff. Within 30 days of receipt of any proposed alternative procedure, the Independent Consultant shall: (i) reasonably evaluate the alternative procedure and determine whether it will achieve the same objective as the Independent Consultant's original recommendation; and (ii) provide the Firm with a written decision reflecting his or her determination. The Firm will abide by the Independent Consultant's ultimate determination with respect to any proposed alternative procedure and must adopt and implement all recommendations deemed appropriate by the Independent Consultant.

g. Within 30 days after the issuance of the later of the Independent Consultant's Written Report or written determination regarding alternative procedures (if any), HBOLIS shall provide the FINRA staff with a written

implementation report, certified by the President or Chief Executive Officer of HBOLIS, attesting to, containing documentation of, and setting forth the details of the Firm's implementation of the Independent Consultant's recommendations.

h. Within 60 days after the issuance of the later of the Independent Consultant's Written Report or written determination regarding alternative procedures (if any), the Firm's President or Chief Executive Officer shall certify that the Firm's AML program and its supervisory systems and procedures are in compliance with federal securities laws and FINRA Rules.

i. Upon written request showing good cause, the FINRA staff may extend any of the procedural dates set forth above.

The sanctions imposed herein shall be effective on a date set by FINRA staff.

Respondent agrees to pay the monetary sanction upon notice that this AWC has been accepted and that such payment is due and payable. Respondent submitted an Election of Payment form electing to pay the fine imposed by the installment payment plan. The terms of the payment plan will be as follows:

1. A down payment of $225,000, equal to twenty-five percent (25%) of the total fine, must be paid as the initial payment.

2. A fixed interest rate of three percent (3%) over the Prime rate, as published in the Money Rates column of the Wall Street Journal on the day following receipt of the initial payment, will be assessed on the unpaid balance. Interest will accrue daily at the fixed rate on the unpaid balance.

3. Following the initial payment, the entire remaining balance, including accrued interest, shall be paid in forty-eight (48) monthly installment payments, with the final payment due no later than forty-eight months after the due date of the initial payment. An Installment Package, including the cover letter, the Promissory Note, and the Payment Schedule, will be mailed to Respondent upon receipt of the initial payment. The executed (signed and notarized) Promissory Note for the unpaid balance of the fine, including interest, must be returned with Respondent's first installment payment.

4. The entire remaining balance, including accrued interest, can be paid off at any time without penalty.

5. Should the Firm be acquired by any other entity, party, or persons while any fine amounts remain outstanding, the Firm shall condition any such acquisition on the acquirer(s)' assumption of the Firm's fine obligations in

21

this AWC, or else any remaining outstanding fines shall become immediately due and payable prior to the completion of any such acquisition within the four year time period the Firm has to pay the total fine under this AWC.

Respondent specifically and voluntarily waives any right to claim that it is unable to pay, now or at any time hereafter, the monetary sanction imposed in this matter.

## II.

## WAIVER OF PROCEDURAL RIGHTS

Respondent specifically and voluntarily waives the following rights granted under FINRA's Code of Procedure:

A. To have a Formal Complaint issued specifying the allegations against it;

B. To be notified of the Formal Complaint and have the opportunity to answer the allegations in writing;

C. To defend against the allegations in a disciplinary hearing before a hearing panel, to have a written record of the hearing made and to have a written decision issued; and

D. To appeal any such decision to the National Adjudicatory Council ("NAC") and then to the U.S. Securities and Exchange Commission and a U.S. Court of Appeals.

Further, Respondent specifically and voluntarily waives any right to claim bias or prejudgment of the General Counsel, the NAC, or any member of the NAC, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including acceptance or rejection of this AWC.

Respondent further specifically and voluntarily waives any right to claim that a person violated the *ex parte* prohibitions of FINRA Rule 9143 or the separation of functions prohibitions of FINRA Rule 9144, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including its acceptance or rejection.

## III.

## OTHER MATTERS

Respondent understands that:

A. Submission of this AWC is voluntary and will not resolve this matter unless and until it has been reviewed and accepted by the NAC, a Review

Subcommittee of the NAC, or the Office of Disciplinary Affairs ("ODA"), pursuant to FINRA Rule 9216;

B.      If this AWC is not accepted, its submission will not be used as evidence to prove any of the allegations against the Firm; and

C.      If accepted:

   1.   This AWC will become part of Respondent's permanent disciplinary record and may be considered in any future actions brought by FINRA or any other regulator against it;

   2.   This AWC will be made available through FINRA's public disclosure program in response to public inquiries about the Firm's disciplinary record;

   3.   FINRA may make a public announcement concerning this agreement and the subject matter thereof in accordance with FINRA Rule 8313; and

   4.   Respondent may not take any action or make or permit to be made any public statement, including in regulatory filings or otherwise, denying, directly or indirectly, any finding in this AWC or create the impression that the AWC is without factual basis. Respondent may not take any position in any proceeding brought by or on behalf of FINRA, or to which FINRA is a party, that is inconsistent with any part of this AWC. Nothing in this provision affects Respondent's right to take legal or factual positions in litigation or other legal proceedings in which FINRA is not a party.

D.      Respondent may attach a Corrective Action Statement to this AWC that is a statement of demonstrable corrective steps taken to prevent future misconduct. Respondent understands that it may not deny the charges or make any statement that is inconsistent with the AWC in this Statement. This Statement does not constitute factual or legal findings by FINRA, nor does it reflect the views of FINRA or its staff.

23

The undersigned, on behalf of the Firm, certifies that a person duly authorized to act on its behalf has read and understands all of the provisions of this AWC and has been given a full opportunity to ask questions about it; that the Firm has agreed to its provisions voluntarily; and that no offer, threat, inducement, or promise of any kind, other than the terms set forth herein and the prospect of avoiding the issuance of a Complaint, has been made to induce the Firm to submit it.

9/24/2012
Date

Respondent Hold Brothers On-Line
Investment Services, LLC

By: _Steven Hold   President_
[Name and title]

Reviewed by:

_Martin H. Kaplan/PP_

Martin H. Kaplan
Gusrae Kaplan Nusbaum PLLC
120 Wall Street, 11th Floor
New York, New York 10005

Accepted by FINRA:

9/25/12
Date

Signed on behalf of the
Director of ODA, by delegated
authority

Samuel L. Israel
Associate Vice President and
Chief Counsel
FINRA
Department of Enforcement
15200 Omega Drive
3rd Floor
Rockville, MD 20850-3241
Tel: 301-258-8546
Fax: 202-721-8316

24