# Exhibit C

SANJAY WADHWA
ASSOCIATE REGIONAL DIRECTOR
Andrew M. Calamari
Thomas P. Smith, Jr.
Preethi Krishnamurthy
John J. Graubard
Vanessa De Simone
Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Room 400
New York, NY 10281-1022
(212) 336-9157 (De Simone)
desimonev@sec.gov
Attorneys for Petitioner

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Petitioner, | 14 CV 07286 (KSH) (CLW) |
| v. | |
| HOLD BROTHERS ON-LINE INVESTMENT SERVICES, LLC, now known as TAFFERER TRADING, LLC, GREGORY HOLD, and STEVEN HOLD, | |
| Respondents. | |

**AMENDED APPLICATION TO ENFORCE FINAL ORDER AS TO
HOLD BROTHERS ON-LINE INVESTMENT SERVICES, LLC,
AND TO IMPOSE CONTROL PERSON LIABILITY
ON GREGORY HOLD AND STEVEN HOLD**

Petitioner United States Securities and Exchange Commission (the "Commission"), whose

New York Regional Office is located at 200 Vesey Street, Brookfield Place, Room 400, New York,

New York 10281-1022, for its Application against Respondent Hold Brothers On-Line Investment

Services, LLC ("Old Hold"), which conducted business at 525 Washington Boulevard, Jersey City

(Hudson County), New Jersey 07310; Respondent Gregory Hold, 400 Chambers Street, New York,

New York 20282-1003; and Respondent Steven Hold, 3 Stonewood Court, Warren (Somerset County), New Jersey 07059-2701, alleges as follows:

## SUMMARY

1.     This is an Application for an order enforcing a Commission consent order against Old Hold and holding Gregory and Steven Hold jointly and severally liable with Old Hold, as control persons, for any unpaid amounts due under that consent order.

2.     Gregory and Steven Hold — the eponymous Hold brothers — founded Old Hold in 1994. Gregory Hold was at all relevant times the chief executive officer ("CEO") of Old Hold, a broker-dealer. Until at least September 25, 2012, Steven Hold was Old Hold's president, and Gregory and Steven Hold together controlled the firm.

3.     In approximately September 2010, the Commission commenced an investigation of certain manipulative trading practices by traders who were using Old Hold's trading systems.

4.     By August 2012, Old Hold had agreed to settle with the Commission in part by paying over $2.5 million in five installments over approximately one year.

5.     On September 25, 2012, the Commission issued a consent order (the "Final Order") in an administrative proceeding captioned *In the Matter of Hold Brothers On-Line Services, LLC, Demostrate, LLC, Trade Alpha Corporate Ltd, Steven Hold, Robert Vallone and William Tobias* (AP File No. 3-15046), attached hereto as Exhibit 1. The Final Order found that Old Hold had violated the federal securities laws by enabling and failing to adequately monitor deceptive trading practices by certain offshore traders who used its systems. It required Old Hold to pay disgorgement, civil penalties, and post-order interest totaling $2,535,237.44 in five installments over the next 360 days.

6.     Old Hold made only the first scheduled payment of $503,333.40, on approximately October 5, 2012, before defaulting on the remaining four payments, totaling over $2 million.

7.      Instead of causing Old Hold to pay the amounts due to the Commission, Gregory and Steven Hold shut down Old Hold and deliberately moved the trading business that had been conducted through Old Hold, along with certain Old Hold assets, to another broker-dealer they owned and controlled, Hold Brothers Capital, LLC ("New Hold").

8.      Among other things, Gregory and Steven Hold caused traders who had previously traded with Old Hold to transfer their equity interests in Old Hold to New Hold and begin trading with New Hold. Gregory Hold also caused Old Hold to transfer over $2.5 million to New Hold (and at least one other entity he and Steven Hold owned and controlled) through purported consulting fees and direct payments to vendors for New Hold's benefit.

9.      These transfers allowed the trading business that Gregory and Steven Hold had originally maintained under the Old Hold name to continue under the New Hold name, essentially uninterrupted and unencumbered by Old Hold's liability to the Commission.

10.     Gregory Hold benefited from these transfers as New Hold's primary owner, and Steven Hold benefited from these transfers as an equity holder in New Hold.

11.     Old Hold, on the other hand, was left unable to pay the amounts owed to the Commission.

12.     The Commission therefore applies, pursuant to Section 21(e)(1) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u(e)(1), for an order to enforce Old Hold's compliance with the Final Order. The Commission further applies, pursuant to Sections 20(a) and 21(e)(1) of the Exchange Act, for an order finding that Gregory and Steven Hold, as control persons of Old Hold, are jointly and severally liable with Old Hold for payment of the unpaid amounts.

## PARTIES

13.     The Commission is an agency of the United States Government.

14.     Old Hold, now known as Tafferer Trading LLC, is a Delaware limited liability company. From January 1995 to February 18, 2013, Old Hold was a broker-dealer registered with the Commission. Although Old Hold now appears to be inoperative, it maintains its legal existence and appears to be in good standing with the State of Delaware. Old Hold conducted business at 525 Washington Boulevard, Jersey City (Hudson County), New Jersey 07310. Old Hold's last known business address is 1177 Avenue of the Americas, Suite 2B, New York, New York 10036.

15.     Gregory Hold, age 44, co-founded Old Hold with his brother Steven Hold and served as its CEO at all relevant times. Gregory Hold also co-founded New Hold with Steven Hold and served as its CEO at all relevant times.

16.     Steven Hold, age 43, co-founded Old Hold with his brother Gregory Hold. Until September 25, 2012, Steven Hold was the president of Old Hold. Steven Hold also co-founded New Hold and, until September 25, 2012, served as its "managing member."

## JURISDICTION AND VENUE

17.     This Court has jurisdiction of this Application under Sections 21(e)(1) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(e)(1) and 78aa(a).

18.     Venue lies in the District of New Jersey. Old Hold transacted business in this District, and Steven Hold resides in this District.

## FACTS

**A.**  **Old Hold's and New Hold's Respective Businesses Prior to 2012.**

19.     Beginning in 1995, Gregory and Steven Hold operated Old Hold primarily as an on-line trading platform for day trading — specifically, short-term equities and options trading. Among other services, Old Hold offered traders use of proprietary trading software developed by HoldSoftware.com, Inc. ("Hold Software"), access to the equities markets through vendors like Equinix, and market data through vendors like Bloomberg LLP and eSignal. Old Hold made money by retaining a portion of any profits earned by the traders who used its platform.

20.     Many of the traders who used Old Hold's trading platform made capital contributions to Old Hold and thus became equity holders in Old Hold. These equity holders were known as "Class B" members.

21.     Old Hold's Operating Agreement, dated March 22, 2004, provided that "[n]othing contained herein shall be construed to deem any Member [including any Class B Member] to be a 'customer' of the Company" for certain enumerated regulatory purposes. The Operating Agreement also provided that the capital account of any Class B member "is an asset of the Company and, as such, is subject to all of the obligations of the Company."

22.     By treating these traders as equity holders rather than customers, Old Hold benefited from by-passing certain otherwise-applicable regulatory requirements. For example, Rule 15c3-3 of the Exchange Act, sometimes referred to as the "Customer Protection Rule," did not require Old Hold to segregate Class B members' capital.

23.     During 2012, Old Hold had approximately 125 Class B members.

24.     In addition to these Class B members, Old Hold also had a number of customer accounts, including customer accounts held by Demostrate, LLC ("Demostrate") and Trade Alpha Corporate, Ltd. ("Trade Alpha"). Demostrate and Trade Alpha were two foreign shell companies

Gregory and Steven Hold created and owned. Many overseas traders used the Demostrate and Trade Alpha accounts at Old Hold to access the United States securities markets. Demostrate and Trade Alpha provided these overseas traders with funds they used to trade in exchange for a percentage of their trading profits.

25. In 2009, Gregory and Steven Hold founded New Hold, a New Jersey limited liability corporation. New Hold registered with the Commission as a broker-dealer on May 6, 2010.

26. At all relevant times, Gregory Hold was the primary owner of New Hold. Until October 1, 2012, Steven Hold also was listed in New Hold's FINRA filings as an owner of New Hold. On October 1, 2012, New Hold amended its FINRA records to remove Steven Hold as a listed owner of the company, but Steven Hold continued until 2014, and on information and belief, continues to hold a "Class A" equity interest in New Hold.

27. At all relevant times, New Hold shared an office location with Old Hold.

28. New Hold also shared key employees and managers with Old Hold including — in addition to Gregory and Steven Hold — a chief compliance officer and a chief financial officer.

29. Prior to late 2012, New Hold conducted limited trading activity. For example, New Hold's revenue from trading activity for the third quarter of 2012 was only approximately $628,000, compared to approximately $4 million for Old Hold for the same period.

**B.** **Old Hold Violates the Federal Securities Laws.**

30. In September 2010, the Commission launched an investigation into a sophisticated type of market manipulation called "layering" or "spoofing." "Spoofing" uses non-*bona fide* orders — orders the trader does not intend to execute — to create an appearance of legitimate trading activity. The Commission's investigation revealed that, from at least January 2009 through September 2010 (the "Manipulation Period"), offshore traders who accessed the United States securities markets through the Demostrate account at Old Hold used spoofing schemes to induce

other market participants into trades. Old Hold enabled the manipulative activity by failing to adequately monitor for and investigate the manipulative trading, despite many red flags.

31.     During the Manipulation Period, Steven Hold received red flags concerning the manipulative trading. For example, he received an e-mail from a senior Old Hold executive describing complaints from two exchanges about traders "who were trying to make a stock look active by sending/canceling a lot of orders." Yet Old Hold failed to address the traders' conduct and continued to assist the offshore traders by supplying them with funds, buying power, and access to the United States markets.

32.     The manipulative "spoofing" trades yielded a profit of approximately $1.8 million to Old Hold and, as owners of Demostrate, Gregory and Steven Hold.

**C.     The Commission Accepts Old Hold's Settlement Offer.**

33.     Beginning in approximately February 2012, Old Hold and its counsel began settlement discussions with the Commission staff. From the start, the Commission staff made clear to Old Hold that any settlement would require the payment of substantial monetary relief.

34.     When the settlement negotiations began, Old Hold's filings with the Financial Industry Regulatory Authority ("FINRA") indicated that Old Hold had the financial resources to pay the Commission at least several million dollars. Specifically, on February 29, 2012, Old Hold filed an audited financial report for the period ended December 31, 2011. The report stated that Old Hold's assets exceeded its liabilities by over $6.4 million and that it held over $4.5 million of assets in cash or cash equivalents — assets that could easily be used to fund a settlement.

35.     Gregory and Steven Hold directed and authorized settlement negotiations on Old Hold's behalf. Gregory and Steven Hold therefore knew by March 2012 at the latest that Old Hold would be required to pay a substantial amount to the Commission to reach a settlement.

36.     On August 10, 2012, Old Hold, as directed by Gregory and Steven Hold, tendered a signed offer of settlement to the Commission. Old Hold consented to the issuance of a Commission order requiring it to pay disgorgement, civil penalties, and post-order interest totaling $2,535,237.44 in five scheduled installments over 360 days. Steven Hold signed the settlement offer on behalf of Old Hold.

37.     After Old Hold submitted the settlement offer, the Commission and Old Hold agreed to certain changes to the contemplated Commission order. The changes did not alter the payment amount or schedule.

38.     On September 10, 2012, Old Hold, as directed by Gregory and Steven Hold, tendered a revised offer of settlement to the Commission with the negotiated changes. Old Hold once again consented to the issuance of a Commission order requiring it to pay disgorgement, civil penalties, and post-order interest totaling $2,535,237.44 in five scheduled installments over 360 days. Steven Hold again signed the settlement offer on Old Hold's behalf.

39.     The Commission accepted Old Hold's revised settlement offer.

40.     On September 25, 2012, the Commission issued the Final Order, which incorporated the settlement offer's terms and named Steven Hold (but not Gregory Hold) as a respondent, on consent.

41.     The Final Order required Old Hold to pay disgorgement, a civil penalty, and post-order interest totaling $2,535,237.44 in five installments: (1) $503,333.40 within ten days of the Final Order's entry; (2) $510,759.63 within ninety days of the Final Order's entry; (3) $508,903.08 within one hundred eighty days of the Final Order's entry; (4) $507,046.52 within two hundred seventy days of the Final Order's entry; and (5) $505,194.81 within three hundred sixty days of the Final Order's entry. The Final Order further provided that if any payment deadline was missed, the entire

outstanding judgment amount, plus any additional interest required by Commission Rule of Practice 600 and 31 U.S.C. § 3717, would be due and payable immediately.

42.     The Final Order also barred Steven Hold from associating with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization for two years and from associating in a supervisory capacity with any such entity for three years.

43.     Steven and Gregory Hold knew that the Final Order was issued and that it required Old Hold to pay the Commission over $2.5 million over the following year.

**D.     Old Hold Fails to Comply with the Final Order and Ceases Operations.**

44.     On October 3, 2012, eight days after the Final Order was issued and less than a month after tendering its revised settlement offer to the Commission, Old Hold changed its name to Tafferer Trading LLC.

45.     On approximately October 5, 2012, Old Hold paid the first installment of $503,333 to the Commission, as the Final Order required.

46.     On October 12, 2012, three weeks after the Final Order was issued, Old Hold ceased doing business as a broker-dealer and filed a Form BDW to withdraw its Commission registration as a broker-dealer.

47.     After paying the first installment, Old Hold failed to pay the second scheduled installment, due on December 24, 2012. Once Old Hold missed the second payment deadline, the entire remaining settlement amount of over $2 million became due, under the Final Order's terms.

48.     The Commission terminated Old Hold's broker-dealer registration on February 18, 2013.

49.     To date, Old Hold has made no further payments under the Final Order.

**E.**     **Gregory and Steven Hold Control Old Hold's
and New Hold's Finances and Legal Affairs.**

50.     Until at least September 25, 2012, Gregory and Steven Hold together controlled Old Hold's operations, finances, and legal affairs.

51.     Among other things, Gregory and Steven Hold directed and authorized Old Hold to enter into the settlement with the Commission resulting in the Final Order.

52.     Until at least September 25, 2012, Gregory and Steven Hold exercised the authority to approve or disapprove Old Hold's payments, including to third parties and other entities they controlled.

53.     Old Hold's Forms BD, filed with the Commission, identified both Gregory and Steven Hold as "Control Person[s]" of Old Hold until October 11, 2012, when Old Hold amended its Form BD and ceased listing Steven Hold as a control person.

54.     Gregory Hold has acknowledged that, as Old Hold's CEO, he could "certainly tell [managers and executives of Old Hold] what to do."

55.     At least before September 25, 2012, Steven Hold was Old Hold's president. In that role, Steven Hold directly or indirectly supervised numerous key executives and departments, including Old Hold's chief financial officer, chief operations officer, trade support department, compliance department, accounting department, and business development department.

56.     At least before September 25, 2012, Gregory and Steven Hold together served as the "Board" of Old Hold. They conducted "Board calls" to discuss the management of Old Hold. Nobody besides Gregory and Steven Hold typically attended these Board calls.

57.     At least until October 11, 2012, Gregory and Steven Hold controlled Old Hold through their ownership of Hold Brothers, Inc. ("Hold Inc."). Together, they owned 100% of Hold Inc., Old Hold's majority owner at all relevant times. For example, on September 18, 2012, just

before the Final Order's entry, Old Hold filed a Form BD stating that Hold Inc. then held over 75% of Old Hold. Similarly, on October 11, 2012, shortly after the Final Order was issued, Old Hold filed a Form BD stating that Hold Inc. still held over 75% of Old Hold. Both of these Form BD filings listed Gregory Hold and Steven Hold as the sole "Indirect Owners" of Old Hold.

58.     On October 22, 2012, Old Hold amended its Form BD to remove Steven Hold as an indirect owner.

59.     FINRA records continue to list Hold Inc. as the owner of over 75% of Old Hold and Gregory Hold as the owner of over 75% of Hold Inc.

60.     After the Final Order's entry in September 2012, Gregory Hold continued to control Old Hold's finances and payments and also controlled New Hold's finances and payments.

61.     Until February 2013, when Old Hold ceased filing Forms BD with the Commission, Old Hold's Forms BD listed Gregory Hold as a control person.

62.     Both before and after entry of the Final Order, Gregory Hold required Old Hold employees to submit nearly all Old Hold bills to him for review and approval before they could be paid, even when these expenses were trivial. For example, on September 26, 2012, an Old Hold employee sought Gregory Hold's approval to pay a $50 vendor invoice.

63.     Gregory Hold chastised Old Hold employees who failed to present bills to him before paying them or failed to give him adequate time to review bills before payment.

64.     For example, in March 2012, an Old Hold employee asked Gregory Hold for approval to pay an electric bill and noted that the bill required immediate payment to avoid additional payments of interest and penalties. Gregory Hold responded by email: "Why did you wait until today, the last minute?" When the employee explained that he had requested "going over them every time we meet," Gregory Hold responded, "I don't recall you asking me to approve an electric

bill in the past few weeks. I recall approving one a few weeks ago and having a concern that one was skipped by you. Is this the case?"

65.     Gregory Hold similarly exercised tight control over New Hold's finances and payments.

66.     For example, in January 2013, a New Hold vice president asked Gregory Hold for permission to pay another employee 45 minutes of overtime compensation. After Gregory Hold failed to respond quickly, the vice president instructed a third employee to make the payment unless Gregory Hold objected. Gregory Hold then chastised the vice president by email: "You can't send out firm funds without my approval. My lack of approval is not an approval. Please don't do this again."

67.     Similarly, on February 5, 2015, Gregory Hold received an email from a Hold Software employee, who had also been an employee of Old Hold and had at least performed services for New Hold, about four overdue monthly invoices for bundled telephone, Internet, and television services. The invoices totaled less than $2000. Gregory Hold admonished the employee for not adhering to the payment review system Gregory Hold had had in place for years:

> [S]imply emailing me and/or leaving a stack of bills is not adequate. I almost always need to interview the preliminary approver of the bills. Tell me in person or with a call if you have to and solicit me to review bills in person with you and send me specific emails regarding bills that are getting urgent… Others, like [another employee] at least mostly adhere to the system that I've asked…: 1) sends specific emails regarding which bills are more urgent then [*sic*] others and increase the emails as things become urgent. [The other employee] will send a summary sometimes several days in a row and list what is more urgent and what is less. 2) Solicits me in person to review urgent bills. 3) Prioritizes a stack of bills so if I run out of time in a quick review meeting, at least I will have hit the emergencies. I've been saying most of these things for years.

In his email, Gregory Hold used a signature block that identified him as New Hold's CEO and included a banner logo celebrating "Hold Brothers[:] 1994 [–] 2014[,] 20th Anniversary."

68.     As described below in paragraph 107, Hold Brothers' "20ᵗʰ Anniversary" foundation date of 1994 referred to Old Hold's formation. New Hold did not exist until 2009.

**F.      Gregory and Steven Hold Cause the Transfer of
Assets and Operations From Old Hold to New Hold.**

69.     By shutting down Old Hold and transferring Old Hold's trading business and many of its valuable assets to New Hold, Gregory and Steven Hold caused and culpably participated in Old Hold's failure to pay the Commission more than $2 million Old Hold owed the Commission under the Final Order.

70.     As an owner of both Old Hold and New Hold, Gregory Hold benefited by doing so. Steven Hold also benefited as an equity holder in New Hold.

**1.      Old Hold Moves Its Class B Members to New Hold.**

71.     In early 2012 — just as Gregory and Steven Hold were negotiating a settlement with the Commission — Old Hold began moving Class B members from Old Hold to New Hold by, among other things, seeking the consent of Class B members to transfer their equity capital from Old Hold to New Hold.

72.     Approximately 40 Class B members agreed to close their equity accounts at Old Hold and become Class B members of New Hold. Collectively, Class B members moved more than $2 million in equity capital from Old Hold to New Hold between January 2012 and January 2013.

73.     In the month before the Final Order's entry alone, Class B members moved $1.3 million in equity capital from Old Hold to New Hold.

74.     Between September 25, 2012 — the date of the Final Order — and January 16, 2013, Class B members removed approximately $850,000 in equity capital from Old Hold, approximately $145,000 of which was subsequently transferred to New Hold.

75.     New Hold Class B members continued to use the same proprietary trading software they had used at Old Hold and, on information and belief, also continued to use other services and facilities they had used at Old Hold.

**2.      Old Hold Transfers $2.2 million to a New Hold Account.**

76.     As described above, on September 25, 2012, the Commission issued the Final Order requiring Old Hold to pay $2,535,237.44 over the next 360 days.

77.     As described above, on December 24, 2012, Old Hold failed to pay the second scheduled installment of $510,759.63, due that day. Under the Final Order's terms, Old Hold immediately became liable to the Commission for the entire remaining settlement amount of over $2 million.

78.     Just days later, on or around January 2, 2013, Old Hold retired its account at the National Securities Clearing Corporation ("NSCC"), a subsidiary of the Depository Trust and Clearing Corporation, which clears and settles securities trades. Broker-dealers that, like Old Hold and New Hold, wish to "self-clear" equities trades in the United States markets must maintain a deposit at NSCC, the amount of which depends on the broker-dealer's level of trading activity. Old Hold retired its NSCC account because it no longer engaged in active trading. Around the same time, NSCC increased New Hold's deposit requirement because Old Hold's former Class B members began trading through New Hold instead.

79.     On or around January 2, 2013, NSCC reduced Old Hold's minimum deposit to $500,000, leaving an excess of $2,201,000 in Old Hold's account.

80.     Old Hold did not claim this approximately $2.2 million amount from its retired NSCC account and use the funds to pay the Commission the amount Old Hold owed.

81.     Instead, Old Hold directed NSCC to transfer $2,201,000 from Old Hold's NSCC account to New Hold's NSCC account. In other words, New Hold simply used Old Hold's funds to satisfy New Hold's increased deposit requirement.[1]

**3.      Old Hold Pays New Hold $650,000 Pursuant to a Purported Consulting Agreement.**

82.     On January 7, 2013 — just two weeks after Old Hold had failed to pay the Commission the Final Order's second installment and just days after the NSCC transfer — Old Hold and New Hold entered into a purported consulting agreement (the "Agreement"). Under the Agreement, New Hold agreed to provide "consulting" services to Old Hold over a three-year period, and Old Hold agreed to pay New Hold $650,000 in return. New Hold also agreed to "retain outside counsel where needed, on behalf of Tafferer [Old Hold], with no charge to Tafferer [Old Hold]" — in other words, New Hold purportedly agreed to retain and pay Old Hold's legal fees.

83.     Gregory Hold authorized and signed the Agreement on behalf of both Old Hold and New Hold.

84.     By this time, as described above, Old Hold had already ceased operating as a broker-dealer and, on information and belief, no longer performed any business functions other than maintaining certain required records and responding to regulatory requests for information.

85.     On January 7, 2013, Old Hold transferred $650,000 to New Hold: the entire amount set forth in the Agreement for three years of purported "consulting" services.

86.     During at least the following year, Old Hold received few or no actual consulting services from New Hold.

---

[1]     New Hold may have later transferred some or all of this $2.2 million amount back to Old Hold.

87.     In fact, on September 9, 2013, a Chicago Board Options Exchange representative conducting an anti-money laundering review of New Hold asked New Hold's chief financial officer ("CFO") why Old Hold's $650,000 payment to New Hold had been recorded as a liability on New Hold's internal accounting books. The CFO responded: "This agreement was executed and Hold Brothers Capital [New Hold] received money. It's a liability because it[']s unearned…."

88.     By the end of 2013, New Hold had reduced the book entry for this liability by only $10,000, indicating that the remaining $640,000 had remained unearned.

89.     Nor did New Hold fully pay Old Hold's legal fees, as set forth in the Agreement.

90.     Old Hold recorded in its own general ledger numerous "Purchases" for "Professional Fees – Legal" to various law firms made after the Agreement. In 2013, these recorded fees totaled over $500,000.

91.     New Hold's 2014 financial statements further noted that New Hold owed Old Hold $178,195 "in legal cost[s]" under the Agreement.

92.     Later, in March 2015, Old Hold obtained the residual amount of approximately $500,000 from its NSCC account when NSCC reduced Old Hold's required account balance from approximately $500,000 to zero. Notwithstanding New Hold's purported agreement to pay Old Hold's legal bills, Old Hold used $210,000 of these funds to pay its own legal bills and sent the remainder to Facilitatory, LLC, Demostrate's successor entity, which Gregory and Steven Hold controlled.

**4.      Old Hold Made At Least $400,000 in Payments to Outside Vendors on Behalf of New Hold.**

93.     As described above, Old Hold had ceased operating as a broker-dealer by the end of 2012, and the Commission terminated its broker-dealer registration in February 2013. New Hold took over Old Hold's broker-dealer business.

94.     Throughout 2013 and 2014, however, Old Hold continued to incur and pay substantial expenses for services typically used by broker-dealers.

95.     In fact, Old Hold paid all or virtually all of these expenses and services for New Hold's benefit.

96.     For example, in 2013 and 2014, Old Hold received bills from and made payments totaling over $600,000 to the following vendors (the "Vendors") alone, among many others:

a.  The New York Stock Exchange;

b.  NASDAQ;

c.  Bloomberg LP, a provider of financial information;

d.  Broadridge Financial Solutions, Inc., a provider of securities transaction processing and other operational and technology services for financial firms and securities issuers;

e.  Stock-Borrow.com, a stock information and locating service;

f.  Thompson Financial, a provider of financial information;

g.  O.P.R.A., a provider of information about options pricing;

h.  Equinix, a provider of electronic connections to trading venues;

i.  eSignal, a provider of electronic trading and stock charting services;

j.  Investment Technology Group, a provider of research and execution services for financial firms; and

k.  PDQ ATS, an alternative trading system or "dark pool."

97.     Each of the Vendors provided goods or services related to securities trading and/or the financial markets.

98.     On information and belief, except for limited services related to its residual obligations to maintain records and respond to regulatory information requests, Old Hold neither needed nor used the Vendors' services in 2013 and 2014.

99.     New Hold, on the other hand, conducted an active broker-dealer business that had a need for the Vendors' services throughout 2013 and 2014.

100.     While New Hold may have reimbursed Old Hold for some portion of the Vendors' expenses, New Hold still owed Old Hold at least $401,024 by the end of 2014 for "rent, information services, communications, consulting, insurance, and other miscellaneous fees," as New Hold's financial statements for 2014 reflect.

### 5.     Old Hold Transferred Assets to Other Hold-Controlled Entities.

101.     After the Final Order's entry, Old Hold made payments to other entities, besides New Hold, that Gregory and Steven Hold owned and controlled.

102.     For example, on or around January 31, 2013, Old Hold transferred $1.7 million to Hold Software, another company Gregory and Steven Hold owned. Among other things, Hold Software provided proprietary trading software that first Old Hold and then New Hold traders used.

103.     Once Old Hold ceased operating as a broker-dealer in late 2012 or early 2013, Old Hold had little or no need or use for trading software or other goods or services Hold Software provided.

104.     Indeed, the same month Hold Software received $1.7 million from Old Hold, Hold Software loaned $840,000 to New Hold. Hold Software used $765,000 of the loan amount to obtain a Class B membership, an equity interest, for itself in New Hold — benefiting Hold Software and New Hold and, by extension, Gregory and Steven Hold.

105.     In total, during 2013 and 2014, Old Hand made and received over 300 transfers to and from other entities affiliated with Gregory and/or Steven Hold. While some of these transfers returned certain amounts of cash or other assets to Old Hold, Gregory Hold freely took funds from Old Hold to support his and Steven Hold's other businesses.

### 6.    New Hold Merely Continues Old Hold's Business.

106.    By moving the Class B traders and assets from Old Hold to New Hold, as described above, Gregory and Steven Hold were able to maintain a viable trading firm that (i) shared many of the same Class B traders as Old Hold, (ii) shared nearly all the same management as Old Hold, (iii) operated from the same office as Old Hold, (iv) offered the same proprietary trading software and, on information and belief, the same services and facilities as Old Hold (v) used vendor accounts held in Old Hold's name, and (vi) had largely the same business strategy as Old Hold, but remained unencumbered by Old Hold's debt to the Commission.

107.    Even today, New Hold presents itself as a continuation of Old Hold. For example, New Hold's website states that "Hold Brothers" — defined on the same page as "the marketing name for Hold Brothers Capital LLC [New Hold]" — "open[ed] for business as On-Line Investment Services, Inc. [Old Hold]" in 1994. The website also touts Hold Brothers' twentieth anniversary, a milestone reached only by including Old Hold's years in operation.

108.    This shift of Old Hold's business and assets to New Hold benefited Gregory and Steven Hold as equity holders of New Hold and deprived Old Hold of valuable assets that could and should have been used to pay the amounts it owed the Commission.

### FIRST CLAIM FOR RELIEF
#### Enforcement of Final Order
#### Section 21(e)(1) of the Exchange Act

109.    Paragraphs 1 through 108 are realleged and incorporated by reference as if fully set forth herein.

110.    Section 21(e) of the Exchange Act, 15 U.S.C. § 78u(e), provides that "[u]pon application of the Commission the district courts of the United States . . . shall have jurisdiction to issue writs of mandamus, injunctions, and orders commanding (1) any person to comply with the provisions of this title, the rules, regulations, and orders thereunder."

- 19 -

111.     Old Hold has failed to pay the disgorgement, civil penalty, and post-order interest as ordered by the Commission in the Final Order.

112.     The Commission respectfully requests that this Court issue an order, pursuant to Section 21(e)(1) of the Exchange Act, commanding Old Hold to pay the unpaid disgorgement, civil penalty, and post-order interest required by the Final Order.

### SECOND CLAIM FOR RELIEF
**Control Person Liability**
**Section 20(a) of the Exchange Act**

113.     Paragraphs 1 through 108 are realleged and incorporated by reference as if fully set forth herein.

114.     Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as any controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 21(d)), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

115.     Gregory Hold and Steven Hold controlled Old Hold — a controlled person liable to the Commission — and caused and culpably participated in Old Hold's failure to comply with the Final Order. Gregory Hold and Steve Hold are therefore jointly and severally liable with Old Hold for the unpaid amount of disgorgement, civil penalty, and post-order interest.

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests:

### I.

That the Court enter an Order commanding Old Hold, Gregory Hold, and Steven Hold, jointly and severally, to pay the unpaid balance of disgorgement, civil penalty, and post-order interest as required by the Final Order against Old Hold.

### II.

That the Court enter such other and further orders as may be necessary for enforcement of any order of this Court as to disgorgement and post-order interest thereon by civil contempt or other remedy as allowed by Rule 69(a) of the Federal Rules of Civil Procedure.

### III.

That the Court enter such other and further orders as may be necessary for the enforcement of any order of this Court as to civil penalty and post-order interest thereon pursuant to the Federal Debt Collection Procedures Act, 28 U.S.C. §§ 3001-3308.

### IV.

That the Court retain jurisdiction as appropriate to assure and effect compliance with the orders entered herein.

## V.

That the Court order such other and further relief as may be just and proper.


Dated:        New York, New York
              December 10, 2015

                                    s/ Sanjay Wadhwa
                              Sanjay Wadhwa
                              Andrew M. Calamari
                              Thomas P. Smith, Jr.
                              Preethi Krishnamurthy
                              John J. Graubard
                              Vanessa De Simone
                              SECURITIES AND EXCHANGE
                                   COMMISSION
                              New York Regional Office
                              Brookfield Place
                              200 Vesey Street, Suite 400
                              New York, New York 10281-1022
                              (212) 336-9157 (De Simone)
                              desimonev@sec.gov

## <u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

Pursuant to Local Civil Rule 11.2, I certify that the matter in controversy alleged in the

foregoing Application is not the subject of any other action pending in any court, or of any

pending arbitration or administrative proceeding.

By:  ___s/ Sanjay Wadhwa_____
Sanjay Wadhwa
*Counsel for Petitioner*
U.S. SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Room 400
New York, NY 10281-1022

## DESIGNATION OF AGENT FOR SERVICE

Pursuant to Local Civil Rule 101.1(f), because the Securities and Exchange Commission (the "Commission") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in the above captioned action. Therefore, service upon the United States or its authorized designee, John Andrew Ruymann, United States Attorney's Office for the District of New Jersey, 402 East State Street, Room 430, Trenton, New Jersey 08608, shall constitute service upon the Commission for purposes of this action.

By: ___s/ Sanjay Wadhwa_____
Sanjay Wadhwa
*Counsel for Petitioner*
U.S. SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Room 400
New York, NY 10281-1022

# Exhibit 1

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 67924 / September 25, 2012

INVESTMENT COMPANY ACT OF 1940
Release No. 30213 / September 25, 2012

ADMINISTRATIVE PROCEEDING
File No. 3-15046

| | |
|---|---|
| In the Matter of<br><br>Hold Brothers On-Line Investment<br>  Services, LLC,<br>Demostrate, LLC,<br>Trade Alpha Corporate, Ltd,<br>Steven Hold,<br>Robert Vallone, and<br>William Tobias<br><br><br>       **Respondents.** | ORDER INSTITUTING ADMINISTRATIVE<br>AND CEASE-AND-DESIST PROCEEDINGS<br>PURSUANT TO SECTIONS 15(b) AND 21C<br>OF THE SECURITIES EXCHANGE ACT OF<br>1934 AND SECTION 9(b) OF THE<br>INVESTMENT COMPANY ACT OF 1940,<br>MAKING FINDINGS, AND IMPOSING<br>REMEDIAL SANCTIONS AND<br>CEASE-AND-DESIST ORDERS |

## I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934 ("Exchange Act") and Section 9(b) of the Investment Company Act of 1940 ("Investment Company Act") against Hold Brothers On-Line Investment Services, LLC ("Hold Brothers"), Steven Hold ("Steve Hold"), Robert Vallone ("Vallone"), and William Tobias ("Tobias"); and that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Exchange Act against Demostrate, LLC ("Demostrate") and Trade Alpha Corporate, Ltd ("Trade Alpha," and together with Hold Brothers, Steve Hold, Vallone, Tobias, and Demostrate, the "Respondents").

## II.

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the

Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934 and Section 9(b) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanctions and Cease-and-Desist Orders ("Order"), as set forth below.

## III.

On the basis of this Order and Respondents' Offers, the Commission finds[1] that:

A.    SUMMARY

1.      As gatekeepers to the capital markets, broker-dealers have a responsibility to establish, maintain, and enforce adequate policies and procedures and risk controls in light of the specific risks associated with the broker-dealer's business.   In particular, broker-dealers that provide access to the markets must ensure that they have policies and procedures and systems of controls in place that are reasonably designed to ensure, among other things, compliance with all regulatory requirements that are applicable in connection with the access they provide.   These controls must be reasonably designed to identify and prevent, among other things, abusive trading practices.   Further, if a broker-dealer identifies suspicious activity, whether through the access it provides or not, it must address such activity in an appropriate and timely manner.

2.      From at least January 2009 through September 2010 (the "Relevant Period"), overseas traders who accessed the U.S. markets through respondent Hold Brothers, a registered broker-dealer, engaged in a manipulative trading strategy typically referred to as "layering" or "spoofing" (hereinafter, collectively, "layering").   Hold Brothers failed to adequately monitor for and investigate, in light of red flags, the manipulative trading by these overseas traders.   The manipulative trading was profitable.

3.      Certain of the overseas traders conducted their manipulative trading on the U.S. markets through two Hold Brothers "customer" accounts, which were accounts of two foreign companies – respondents Trade Alpha and Demostrate – created and partially owned by Steve Hold.   Steve Hold funded Demostrate and Trade Alpha, and Demostrate and Trade Alpha provided the capital for the manipulative trading by these traders.   Hold Brothers controlled the overseas traders by, among other things, determining and allocating buying power, establishing stop-loss limits, and, through Hold Brothers affiliated personnel, dictating the profit distribution between Demostrate and Trade Alpha and the traders.

4.      Throughout the Relevant Period, the three individual respondents – Steve Hold, Vallone, and Tobias – became aware of red flags, including several emails, suggesting that the

---

[1]      The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

2

overseas traders who traded through Hold Brothers were engaging in manipulative trading.   The individual respondents recklessly continued to provide traders with buying power and/or access to the U.S. markets, and failed to conduct adequate follow-up despite these warnings.   In addition, Hold Brothers failed to make and keep current the requisite records related to certain brokerage orders given or received for the purchase or sale of securities and failed to furnish promptly to the staff certain order records requested by the staff.

5.      By virtue of this conduct, (a) Trade Alpha and Demostrate violated Section 9(a)(2) of the Exchange Act; (b) Hold Brothers willfully violated Sections 9(a)(2) and 17(a) of the Exchange Act and Rules 17a-4 and 17a-8 thereunder, and failed reasonably to supervise the Demostrate traders in connection with their violations of the securities laws; (c) Steve Hold, Vallone, and Tobias willfully aided and abetted and caused Hold Brothers', Demostrate's and Trade Alpha's violations of Section 9(a)(2) of the Exchange Act; and (d) Steve Hold failed reasonably to supervise Vallone in connection with Vallone's violations of the securities laws.

B.      <u>RESPONDENTS</u>

6.      Hold Brothers is a Delaware limited liability company wholly-owned by, among others, respondent Steve Hold.   Hold Brothers is a FINRA member that has been registered as a broker-dealer pursuant to Section 15(b) of the Exchange Act since January 1995.   Hold Brothers has branch offices in several states, including New York, New Jersey, Pennsylvania, and California.

7.      Demostrate is a limited liability company organized under the laws of Nevis. Steve Hold is an owner of Demostrate.   Overseas traders who traded for Demostrate were organized in groups by location, and the groups were assigned alpha-numeric identifiers, e.g., P18 or P69.

8.      Trade Alpha is a limited liability company organized under the laws of the British Virgin Islands.   Steve Hold is an owner of Trade Alpha.

9.      Steve Hold, age 41, resides in Warren, New Jersey.   Steve Hold is the president and co-founder of Hold Brothers.   Steve Hold holds Series 7, 24, 55, and 63 licenses.

10.      Tobias, age 43, resides in Hoboken, New Jersey.   Tobias is an associated person of Hold Brothers and is the managing member of Demostrate.   Tobias holds Series 7, 27, 28, 55, and 63 licenses.

11.      Vallone, age 62, resides in Princeton Junction, New Jersey.   Until August 2012, Vallone was the Chief Compliance Officer and Chief Financial Officer of Hold Brothers. Vallone holds Series 7, 8, 23, 27, and 63 securities licenses.

C.      <u>BACKGROUND</u>

12.      During the Relevant Period, Hold Brothers was a limited liability company made up of one Class A member, Hold Brothers, Inc., which was wholly owned by Steve Hold and

another individual, and a number of Class B members who conducted proprietary day trading activities. In addition to the Class B proprietary trading members, Hold Brothers executed trades on behalf of retail customer traders, all of whom engaged in some form of day trading. The firm's primary business was to provide market access to its proprietary and customer traders.

13. The majority of Hold Brothers' Class B proprietary traders were located in the United States, while the majority of Hold Brothers' customer traders were located in other countries. Hold Brothers' proprietary trading business consisted of approximately 40 traders. These proprietary traders traded the firm's capital, were monitored for risk and compliance purposes by Hold Brothers personnel, were licensed by the appropriate self-regulatory organization, were associated persons of the firm, and shared with Hold Brothers profits derived from their trading.

14. The vast majority of Hold Brothers' traders located overseas were associated with one of two "customers," either Trade Alpha in 2009 or Demostrate in 2010 (hereinafter, collectively, "Demostrate" or the "Demostrate traders").[2] These traders traded Demostrate's capital and were monitored for risk and compliance purposes by personnel of Hold Brothers and a Hold Brothers affiliate. As an owner, Steve Hold shared in the Demostrate trading profits. Unlike Hold Brothers' proprietary traders, however, Hold Brothers did not consider the Demostrate traders to be associated with the firm, nor did any of these traders hold licenses from any self-regulatory organization.

15. Demostrate maintained a brokerage account at Hold Brothers. Demostrate's managing member was Tobias. Demostrate was was Hold Brothers' largest "customer," both in terms of the number of trades and revenues generated. All Demostrate trading occurred in a single account held at Hold Brothers. All of the persons who traded through Demostrate's account were located outside the United States, primarily in China. Hold Brothers assisted Demostrate and its traders in accessing the securities markets by providing these foreign traders with access to front-end trading platforms and access to the U.S. securities markets.

### D.   HOLD BROTHERS CONTROLLED THE DEMOSTRATE TRADERS

16. During the Relevant Period, Demostrate had no physical offices or employees in the U.S. Hold Brothers and Hold Brothers' affiliate employees supervised Demostrate traders and their trading activity. The primary tasks performed by Tobias as Demostrate's managing member included accounting for and distributing trading profits to the Demostrate traders, while monitoring and review of trading was performed by employees of Hold Brothers or Hold Brothers affiliates, at the behest of Hold Brothers. In addition, Hold Brothers affiliated employees negotiated the most important aspect of the relationship between Demostrate and the foreign traders – the amount of the trading profits that the traders could retain.

---

[2]     Prior to the formation of Demostrate in 2009, Hold Brothers' largest "customer" was Trade Alpha. In late 2009, all of the Trade Alpha traders became authorized traders of Demostrate.

17.     Hold Brothers provided each Demostrate trader with buying power representing the aggregate capital each trader was allowed to expend on stock purchases at any given time. Hold Brothers employees established and controlled changes made to buying power for each trader, determined whether buying power would be increased or decreased, and determined the dollar amount of securities a Demostrate trader could buy and/or sell.

18.     Hold Brothers and Hold Brothers employees monitored Demostrate traders for daily profit and loss and the amount of risk the positions taken by Demostrate traders posed.   In addition, Hold Brothers employees established stop-loss limits to limit the amount of risk a Demostrate trader could assume.   If the trader exceeded his or her daily loss limit, Hold Brothers, not Demostrate, shut down the trader.

19.     Hold Brothers also performed a limited compliance review of Demostrate trading activity.   If, in this review, Hold Brothers determined that a Demostrate trader had engaged in prohibited activity, for example, wash sales or crossed trades, Hold Brothers personnel, not Demostrate personnel, levied sanctions on the Demostrate trader.   Punishment ranged from a warning to suspension of trading privileges, and occasionally resulted in Hold Brothers withholding a trader's trading profits.   Demostrate had very limited involvement in this disciplinary system.

20.     Based on all of the above, the Demostrate traders were controlled by, or under common control with, Hold Brothers, and therefore were associated persons of a broker or dealer, as defined in Section 3(a)(18) of the Exchange Act.

E.     THE MANIPULATIVE TRADING SCHEME

21.     During the Relevant Period, certain Demostrate traders repeatedly manipulated the markets of U.S. listed and over-the-counter stocks by engaging in the practice of layering.

22.     Layering concerns the use of non-bona fide orders, or orders that the trader does not intend to have executed, to induce others to buy or sell the security at a price not representative of actual supply and demand.   More specifically, a trader places a buy (or sell) order that is intended to be executed, and then immediately enters numerous non-bona fide sell (or buy) orders for the purpose of attracting interest to the bona fide order.   These non-bona fide orders are not intended to be executed.   The nature of these orders is to induce, or trick, other market participants to execute against the initial, bona fide order.   Immediately after the execution against the bona fide order, the trader cancels the open, non-bona fide orders, and repeats this strategy on the opposite side of the market to close out the position.

23.     Certain overseas traders trading for Demostrate engaged in extensive manipulative activity.   Such traders induced algorithms to trade in a particular security by placing and then cancelling layers of orders in that security, creating fluctuations in the national best bid or offer of that security, increasing order book depth, and using the non-bona fide orders to send false signals regarding the demand for such security, which the algorithms misinterpreted as reflecting sincere demand.   These overseas traders' orders were intended to deceive and did

deceive certain algorithms into buying (or selling) stocks from (or to) the Demostrate traders at prices that had been artificially raised (or lowered) by the Demostrate traders.

### Example of Layering by a Demostrate Trader

24.　　The pattern of layering against algorithmic traders is illustrated by the activity of a Demostrate trader who traded under the identifier "PEBC" in group P69 from Nanjing, China. On June 4, 2010, the trader layered the stock of W.W. Grainger (NYSE: "GWW") on NASDAQ and the Boston Stock Exchange.

25.　　That day, at 11:08:55.152 a.m., the trader placed an order to sell 1,000 GWW shares at $101.34 per share.   Prior to the trader placing the order, the inside bid was $101.27 and the inside ask was $101.37.   The trader's sell order moved the inside ask to $101.34. From 11:08:55.164 a.m. to 11:08:55.323 a.m., the trader placed eleven orders offering to buy a total of 2,600 GWW shares at successively increasing prices from $101.29 to $101.33.   During this time, the inside bid rose from $101.27 to $101.33, and the trader sold all 1,000 shares she offered to sell for $101.34 per share, completing the execution at 11:08:55.333.   At 11:08:55.932, less than a second after the trader placed the initial buy order, the trader cancelled all open buy orders.   At 11:08:55.991, once the trader had cancelled all of her open buy orders, the inside bid reverted to $101.27 and the inside ask reverted to $101.37.

26.　　Because the trader was now short 1,000 GWW shares, at 11:09:00.881, the trader placed an order to buy 1,000 GWW shares at $101.30, thereby changing the inside bid to $101.30.   From 11:09:00.929 a.m. to 11:09:01.060 a.m., the trader placed eleven orders offering to sell a total of 2,600 GWW shares at successively decreasing prices from $101.35 to $101.31. During this time, the inside ask declined from $101.37 to $101.31, and the trader bought all 1,000 GWW shares she offered to buy for $101.30 per share, completing the execution at 11:09:00.977.   At 11:09:01.662, less than a second after the trader placed the initial sell order, the trader cancelled all open sell orders.   At 11:09:01.792, once the trader had cancelled all of her open sell orders, the inside bid reverted to $101.24 and the inside ask reverted to $101.37. This round trip transaction, which took less than seven seconds to complete, yielded the trader approximately $40.   As described below, this strategy was repeated over and over again.

### The Demostrate Traders' Manipulative Trading was Profitable

27.　　The manipulative trading consisted of anywhere from 67 percent to 95 percent or more of the overall trading activity in several of the groups of overseas traders trading for Demostrate – and it was profitable.   During the Relevant Period, overseas traders trading for Demostrate in the several groups that engaged in layering entered into more than 325,000 layered transactions which corresponded to the entry of more than 8 million layered orders.

28.　　The two Demostrate trading groups that engaged in the most layering were also the most profitable, cumulatively making the owners of Demostrate approximately $1.8 million dollars in trading revenue.

29.     Because the overseas traders were agents of Demostrate and traded through Demostrate's accounts, the traders' conduct can be imputed to Demostrate.  In addition, because Hold Brothers controlled the Demostrate traders, the overseas traders' conduct can be imputed to Hold Brothers.

F.     STEVE HOLD, VALLONE, AND TOBIAS KNEW OR WERE RECKLESS IN NOT KNOWING THAT THE DEMOSTRATE TRADERS WERE ENGAGING IN LAYERING

30.     As early as 2009, Steve Hold, Tobias, and Vallone were on notice that Demostrate traders were engaging in layering and failed to respond sufficiently to red flags informing them of the conduct.    Hold Brothers and its personnel, including the individual respondents, periodically solicited information for compliance reviews from the Demostrate traders concerning the traders' manipulative trading strategies.    For example:

- In April 2009, a Hold Brothers employee requested from a trader in a Demostrate trading group an explanation of the trader's trading strategy.    The trader emailed his strategy to a Chinese-speaking Hold Brothers employee.    This employee translated the document and provided it to Vallone, among others.    The document describes a layering strategy, including moving the bid and ask prices of securities by entering multiple orders, and the cancellation of the orders after the intended to be executed order was filled.

- In February 2010, a Hold Brothers employee requested from a trader in a Demostrate trading group an explanation of the trader's trading strategy.    This employee sent an email to Steve Hold, Vallone, and Tobias, among others, relating a conversation with a Demostrate trader who explained his trading strategy:    "float a invisible sell, say at 26.60. . . .    Then they will float a few visible buys at 26.40, 26.41, 26.42, etc.    At some point, someone will hit that floating invisible sell at 26.60.    Then they'll reverse the course to cover the short position."

- In May 2010, a Hold Brothers employee requested from a trader in a Demostrate trading group an explanation of the trader's trading strategy.    This employee sent an email to Steve Hold, Vallone, and Tobias, among others, discussing the trading strategy of several Demostrate traders, stating that the traders "will try to float both buy and sell orders in-between the current inside bid and ask price. . . . [Then] they will try to push the price down, and then up to make the spread back and forth."

31.     Despite these and other red flags, Steve Hold, Vallone, and Tobias did not take sufficient steps to determine whether the strategies identified above accurately reflected the trading or whether the trading strategies themselves were manipulative, particularly in light of language in emails such as "push the price down, and then up."

32.     Hold Brothers and the individual respondents were also informed by FINRA and national securities exchanges – that is, organizations that either regulate Hold Brothers or handle the orders that Hold Brothers places in the marketplace – that potentially manipulative trading was occurring at Demostrate.    For example:

- In May 2009, a Hold Brothers senior executive wrote two separate emails to Steve Hold, among others, noting that he had fielded complaints from two exchanges involving "massive amounts of orders and cancelling" and traders "who were trying to make a stock look active by sending/canceling a lot of orders."    The senior executive wrote, "from a compliance perspective the problem with this is, when you send an order, you have to send it in good faith that it will be filled."

- In February 2010, in an effort to develop a new compliance report to detect improper trading behavior, a series of internal emails among various Hold Brothers executives, including Vallone, noted that "the SEC is now investigating spoofing incidents . . . and we have been asked to be proactive about this problem."    After a discussion of the proper definition of spoofing, a manager asked, "[w]ouldn't [Demostrate trading group] P69 (Sterling) be guilty of this?"

- In late March 2010, Hold Brothers received an inquiry from FINRA, which was described in an email as a "spoofing inquiry."    After a follow-up call with FINRA in April 2010, a senior Hold Brothers executive emailed Steve Hold, Vallone, and Tobias describing FINRA's concern about possible spoofing by three Demostrate traders during March 2010.

33.     Despite receiving such correspondence, which constituted red flags, Steve Hold, Vallone, and Tobias failed to take sufficient steps to conduct an appropriate review of the trading practices at Demostrate.

34.     Hold Brothers was on notice during the Relevant Period that certain trading groups of Demostrate generated a high number of cancelled orders and that those cancellations were suspicious.    In April 2010, another Hold Brothers employee informed Steve Hold and Tobias about the high number of orders entered and then cancelled by three Demostrate traders in the P18 trading group.    This employee noted that "all the cancels is a problem."    The next day, Steve Hold asked his staff to check order and execution data to determine what percentage of orders were cancelled for one Demostrate trading group.    Trading group P69 was chosen for review.    The review showed that the 55 traders in the group had entered 52,000 executed orders for 11 million shares but, during the same period, had cancelled 152,000, or nearly three times as many orders for 21 million shares.    Despite identifying the activity as "a problem," Respondents failed to take sufficient steps to identify the reason for these cancellations.

35.     Based on the red flags set forth above, the Respondents knew or were reckless in not knowing that certain of the Demostrate overseas traders were engaging in layering.    Neither Hold Brothers nor any of the individual respondents took sufficient action to stop the conduct. On the contrary, notwithstanding the red flags, Hold Brothers, through Steve Hold, Vallone, and Tobias, continued to provide certain of the Demostrate traders with access to trading platforms

and the ability to access the U.S. capital markets.    Steve Hold continued to fund Demostrate, and Demostrate continued to provide trading capital to Demostrate traders.    Tobias, as managing member of Demostrate, assisted in establishing the Demostrate account and continued to provide buying power to the traders, approve traders for trading, and manage the flow of funds to the traders.    Vallone failed to take sufficient corrective action despite receiving emails directed to him asking him to weigh in on the appropriateness of the activity and telling him that he needed to address the significant red flags raised by the trading.

G.    HOLD BROTHERS FAILED REASONABLY TO SUPERVISE THE DEMOSTRATE TRADERS

36.    While Hold Brothers did have systems in place to monitor Demostrate traders' trading, these systems were used primarily to monitor for risk of loss.    Hold Brothers lacked adequate surveillance systems and lacked reasonable procedures to prevent or detect the manipulative layering trading by certain of the Demostrate traders who were associated persons of Hold Brothers.    Until the latter part of 2010, Hold Brothers did not have systems that reviewed excessive order cancellations, and did not have the capability to fully review order and execution data for most trades.

37.    Hold Brothers had few, if any, exception reports adequately designed to catch manipulative trading.    Further, when Hold Brothers personnel did identify potential red flags, Hold Brothers staff failed to implement the procedures that did exist – as is evidenced by the failure of Steve Hold, Vallone, and Tobias to sufficiently address the numerous red flags.    If Hold Brothers had established and implemented reasonable policies and procedures with respect to surveiling for manipulative trading activity, it is likely that they would have prevented and detected the Demostrate traders' violations of Section 9(a)(2).

H.    STEVE HOLD FAILED REASONABLY TO SUPERVISE VALLONE

38.    Steve Hold was Vallone's supervisor.    Steve Hold received the emails indicating possible manipulative trading by the overseas traders, knew that Vallone had been asked to review this trading to determine whether it was manipulative, and that inaction by Vallone could aid any manipulative trading by the Demostrate traders.    Steve Hold failed to ensure that Vallone took steps to determine if the manipulative trading occurred, and failed to sufficiently review Vallone's response to the red flags to ensure that Vallone was not aiding manipulative trading by the Demostrate traders.    If Steve Hold had reasonably supervised Vallone, it is likely that he would have prevented and detected Vallone's aiding and abetting violations of Section 9(a)(2).

I.    HOLD BROTHERS FAILED TO FILE SUSPICIOUS ACTIVITY REPORTS
      FOR SUSPICIOUS TRADING

39.    During the Relevant Period, Hold Brothers failed to file a single Suspicious Activity Report ("SAR").   Hold Brothers failed to file a single SAR despite numerous instances in which traders described their trading strategy to Hold Brothers personnel, which should have raised red flags that the trading was manipulative, and despite the firm detecting wash trading and other suspicious trading involving transactions that totaled over $5,000.

40.    Hold Brothers' failure to file SARs in any of these instances is contrary to its own compliance policies and procedures.   Hold Brothers' policies and procedures relating to its anti-money laundering program instruct firm personnel to file SARs for any suspicious activity conducted or attempted through Hold Brothers and involving or aggregating $5,000 or more of funds or assets if the activity, among other things, "has no business or apparent lawful purpose."

J.    HOLD BROTHERS FAILED TO PRESERVE AND FURNISH ORDER
      INFORMATION

41.    In December 2010, Hold Brothers received a subpoena from the staff asking the firm to produce order and execution data for certain Demostrate trading groups on various dates in 2009 and 2010.   Hold Brothers did not produce order and execution data until July 2011, and subsequently informed the staff that the production was incomplete because records covering a two-month period in 2009 were missing.

42.    In May 2011, Hold Brothers informed the manufacturer of the trading system used by the majority of the Demostrate traders of "data gaps" in its records, and requested assistance.   On July 1, 2011, Hold Brothers made yet another production of order and execution data to the staff.   This production, while containing some of the previously unproduced data for 2009, was still not complete, as it lacked data for August and September of 2009.   Ultimately, Hold Brothers informed the staff that it could not produce the data for any trading day during those two months.

K.    VIOLATIONS

43.    As a result of the conduct described above, Demostrate and Trade Alpha violated Section 9(a)(2) of the Exchange Act, which prohibits any person from "effect[ing], alone or with one or more other persons, a series of transactions in any security . . . creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."

44.    As a result of the conduct described above, Hold Brothers willfully violated Section 9(a)(2) of the Exchange Act, which prohibits any person from "effect[ing], alone or with one or more other persons, a series of transactions in any security . . . creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."

45.     As a result of the conduct described above, Hold Brothers willfully violated Section 17(a) of the Exchange Act, which requires, in pertinent part, that registered brokers or dealers make and keep for prescribed periods records that the Commission deems necessary or appropriate in the public interest for the protection of investors, and certain rules adopted under Section 17(a), including (i) Rule 17a-4(b)(1), which requires that registered brokers and dealers preserve for a period of not less than three years, the first two years in an easily accessible place, among other things, "a memorandum of each brokerage order, and of any other instruction, given or received for the purchase or sale of securities, whether executed or unexecuted," (ii) Rule 17a-4(j), which requires that registered brokers and dealers "furnish promptly to a representative of the Commission legible, true, complete, and current copies of those records" that are required to be preserved under Section 17(a), and (iii) Rule 17a-8, which requires that brokers and dealers comply with the reporting, recordkeeping, and record retention requirements of the rules promulgated under the Currency and Financial Transactions Reporting Act of 1970 (commonly known as the Bank Secrecy Act), 12 U.S.C. §1829b, 12 U.S.C. §§1951-1959, and 31 U.S.C. §§5311-5330.

46.     As a result of the conduct described above, Hold Brothers failed reasonably to supervise their associated persons, the Demostrate traders, within the meaning of Section 15(b)(4)(E) of the Exchange Act with a view to preventing and detecting their violations of Section 9(a)(2) of the Exchange Act.

47.     As a result of the conduct described above, Steve Hold, Vallone, and Tobias willfully aided and abetted and caused Demostrate's, Trade Alpha's, and Hold Brothers' violations of Section 9(a)(2) of the Exchange Act, which prohibits any person from "effect[ing], alone or with one or more other persons, a series of transactions in any security . . . creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."

48.     As a result of the conduct described above, Steve Hold failed reasonably to supervise Vallone within the meaning of Section 15(b)(4)(E) of the Exchange Act, as incorporated by reference in Section 15(b)(6) of the Exchange Act, with a view toward preventing and detecting Vallone's violation of the federal securities laws.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondents' Offers.

Accordingly, pursuant to Sections 15(b) and 21C of the Exchange Act and Section 9(b) of the Investment Company Act, it is hereby ORDERED that:

A.     Pursuant to Section 21C of the Exchange Act, Respondents Demostrate and Trade Alpha shall cease and desist from committing or causing any violations and any future violations of Section 9(a)(2) of the Exchange Act.

B.      Pursuant to Section 21C of the Exchange Act, Respondent Hold Brothers shall cease and desist from committing or causing any violations and any future violations of (i) Section 9(a)(2) of the Exchange Act, and (ii) Section 17(a) of the Exchange Act and Rules 17a-4 and 17a-8 thereunder.

C.      Pursuant to Section 21C of the Exchange Act, Respondents Steve Hold, Vallone, and Tobias shall cease and desist from committing or causing any violations and any future violations of Section 9(a)(2) of the Exchange Act.

D.      Pursuant to Section 15(b) of the Exchange Act and Section 9(b) of the Investment Company Act, Respondents Vallone and Tobias be, and hereby are:

> barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization;

> prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter; and

> barred from participating in any offering of penny stock, including: acting as a promoter, finder, consultant, agent or other person who engages in activities with a broker, dealer or issuer for purposes of the issuance or trading in any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock

with the right to apply for reentry after three (3) years to the appropriate self-regulatory organization, or if there is none, to the Commission.

E.      Pursuant to Section 15(b) of the Exchange Act and Section 9(b) of the Investment Company Act, Respondent Steve Hold be, and hereby is:

> barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization;

> prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter; and

> barred from participating in any offering of penny stock, including: acting as a promoter, finder, consultant, agent or other person who engages in activities with a broker, dealer or issuer for purposes of the issuance or trading in any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock

12

with the right to apply for reentry after two (2) years to the appropriate self-regulatory organization, or if there is none, to the Commission.

F.     Pursuant to Section 15(b) of the Exchange Act, Respondent Steve Hold be, and hereby is, barred from association in a supervisory capacity with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization, with the right to apply for reentry after three (3) years to the appropriate self-regulatory organization, or if there is none, to the Commission.

G.     Pursuant to Section 15(b) of the Exchange Act, Respondent Hold Brothers is censured.

H.     Any reapplication for association by Respondents Steve Hold, Vallone, and Tobias will be subject to the applicable laws and regulations governing the reentry process, and reentry may be conditioned upon a number of factors, including, but not limited to, the satisfaction of any or all of the following:   (a) any disgorgement ordered against Respondents Steve Hold, Vallone and Tobias, whether or not the Commission has fully or partially waived payment of such disgorgement; (b) any arbitration award related to the conduct that served as the basis for the Commission order; (c) any self-regulatory organization arbitration award to a customer, whether or not related to the conduct that served as the basis for the Commission order; and (d) any restitution order by a self-regulatory organization, whether or not related to the conduct that served as the basis for the Commission order.

I.     Respondent Hold Brothers shall pay disgorgement of $629,167 plus agreed upon post-Order interest of $9,285.22 pursuant to SEC Rule of Practice 600, for a total of $638,452.22, to the United States Treasury.   Payment of disgorgement and interest shall be made in five (5) installments according to the following schedule:

- Payment 1, in the amount of $125,833.40, due within ten (10) days of the entry of this Order.
- Payment 2, in the amount of $129,546.52, due within ninety (90) days of the entry of this Order.
- Payment 3, in the amount of $128,618.24, due within one hundred eighty (180) days of the entry of this Order.
- Payment 4, in the amount of $127,689.96, due within two hundred seventy (270) days of the entry of this Order.
- Payment 5, in the amount of $126,764.10, due within three hundred sixty (360) days of the entry of this Order.

If any payment is not made by the date the payment is required by this Order, the entire outstanding balance of disgorgement, plus any additional interest accrued pursuant to SEC Rule of Practice 600, shall be due and payable immediately, without further application.   Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Respondent may also pay by certified check, bank cashier's check, or United States postal

money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> HQ Bldg., Room 181, AMZ-341
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the file number of these proceedings; Hold Brothers as a respondent in these proceedings; and specifying that payment is made pursuant to this Order.   A copy of the cover letter and money order or check shall be sent to Sanjay Wadhwa, Associate Director and Deputy Chief, Market Abuse Unit, Division of Enforcement, U.S. Securities and Exchange Commission, 3 World Financial Center, Suite 400, New York, NY 10281-1022.

J.      Respondent Hold Brothers shall pay a civil money penalty in the amount of $1,887,500 plus agreed upon post-Order interest of $9,285.22 pursuant to 31 U.S.C. 3717, for a total of $1,896,785.22, to the United States Treasury.   Payment of penalty and interest shall be made in five (5) installments according to the following schedule:

- Payment 1, in the amount of $377,500, due within ten (10) days of the entry of this Order.
- Payment 2, in the amount of $381,213.11, due within ninety (90) days of the entry of this Order.
- Payment 3, in the amount of $380,284.84, due within one hundred eighty (180) days of the entry of this Order.
- Payment 4, in the amount of $379,356.56, due within two hundred seventy (270) days of the entry of this Order.
- Payment 5, in the amount of $378,430.71, due within three hundred sixty (360) days of the entry of this Order.

If any payment is not made by the date the payment is required by this Order, the entire outstanding balance of penalty, plus any additional interest accrued pursuant to 31 U.S.C. 3717, shall be due and payable immediately, without further application.   Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.   Respondent may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> HQ Bldg., Room 181, AMZ-341
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the file number of these proceedings; Hold Brothers as a respondent in these proceedings; and specifying that payment is made pursuant to this Order.   A copy of the cover letter and money order or check shall be sent to Sanjay Wadhwa, Associate Director and Deputy Chief, Market Abuse Unit, Division of Enforcement, U.S. Securities and Exchange Commission, 3 World Financial Center, Suite 400, New York, NY 10281-1022.

K.      Respondent Demostrate shall, within ten (10) days of the entry of this Order, pay disgorgement in the amount of $1,258,333 to the United States Treasury.   If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600.   Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Respondent may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> HQ Bldg., Room 181, AMZ-341
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the file number of these proceedings; Demostrate as a respondent in these proceedings; and specifying that payment is made pursuant to this Order.   A copy of the cover letter and money order or check shall be sent to Sanjay Wadhwa, Associate Director and Deputy Chief, Market Abuse Unit, Division of Enforcement, U.S. Securities and Exchange Commission, 3 World Financial Center, Suite 400, New York, NY 10281-1022.

L.      Respondents Steve Hold, Vallone, and Tobias each shall, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $75,000 to the United States Treasury.   If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. 3717.   Each Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.   Each Respondent may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> HQ Bldg., Room 181, AMZ-341
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the file number of these proceedings; Steve Hold's, Vallone's, or Tobias' name as a respondent in these proceedings; and specifying that payment is made pursuant to this Order. A copy of the cover letter and money order or check shall be sent to Sanjay Wadhwa, Associate Director and Deputy Chief, Market Abuse Unit, Division of Enforcement, U.S. Securities and Exchange Commission, 3 World Financial Center, Suite 400, New York, NY 10281-1022.

By the Commission.


Elizabeth M. Murphy
Secretary

16